**KANSAS CITY POWER & LIGHT CO.**
**et al. v. McKAY, Secretary of**
**the Interior, et al.**

**Civ. A. No. 4276–50.**

United States District Court
District of Columbia.

June 17, 1953.

41. Hill v. Texas, 1942, 316 U.S. 400, 406, 62 S.Ct. 1159, 86 L.Ed. 1559; Dowd v. U. S. ex rel. Cook, 1951, 340 U.S. 206, 210, 71 S.Ct. 262, 95 L.Ed. 215.

42. Bryant v. United States, 8 Cir., 1914, 214 F. 51; Mitchell v. Youell, 4 Cir., 1942, 130 F.2d 880; United States v. Lowrey, D.C., 77 F.Supp. 301, affirmed, 3 Cir.1949, 172 F.2d 226.

---

Wilmer & Broun, E. Fontaine Broun, Henry T. Rathbun, Washington, D. C., Baker, Hostetler & Patterson, Raymond T. Jackson, Sidney D. L. Jackson, Jr., John R. Baskin, Alan G. Rorick, Cleveland, Ohio, for plaintiffs.

Spencer, Fane, Britt & Browne, Arthur J. Doyle, Kansas City, Mo., for Kansas City Power & Light Co.

Floyd M. Sprague, St. Joseph, Mo., for St. Joseph Light & Power Co.

Patterson, Cowherd, Smith & Patterson, A. Z. Patterson, Kansas City, Mo., for Missouri Public Service Co., Arkansas-Missouri Power Co., and Missouri Edison Co.

R. K. McPherson, Joplin, Mo., for Empire Dist. Electric Co.

James D. James, Lester G. Seacat, Jefferson City, Mo., for Missouri Power & Light Co.

John A. Woodbridge, Charles J. Dougherty, St. Louis, Mo., for Union Electric Co. of Missouri.

Oliver & Oliver, R. B. Oliver, Jr., Cape Girardeau, Mo., for Missouri Utilities Co.

Holmes Baldridge, Asst. Atty. Gen., Charles M. Irelan, U. S. Atty., Washington, D. C. (Edward H. Hickey, Morton Liftin, Attys., Department of Justice, W. Carroll Hunter, Sol., Bernard Gekoski, Henry E. Freedman, Attys., Department of Agriculture, Mastin G. White, Sol., Theodore H. Haas, Atty., Department of the Interior, Washington, D. C., R. L. Davidson, Chief Counsel, Jesse L. Ballard, Atty., Southwestern Power Administration, Tulsa, Okl., of counsel), for defendants.

Dalton, Treasurer & Dalton, John M. Dalton, Kennett, Mo., for M & A Electric Power Cooperative, amicus curiae.

Jack L. Rorschach, Vinita, Okl., for Kamo Electric Cooperative, Inc., amicus curiae.

Stockard & Stockard, Alden A. Stockard, Gregory C. Stockard, Jefferson City, Mo., for Central Electric Power Cooperative, and Sho-Me Power Corp. amici curiae.

Pickett, Pickett & Andereck, Trenton, Mo., of counsel, Eugene E. Andereck, Phil Hauck, Russell N. Pickett, Trenton, Mo., for N. W. Electric Power Cooperative, Inc., amicus curiae.

McLAUGHLIN, District Judge.

On October 3, 1950, Kansas City Power & Light Company, of Kansas City, Missouri, and nine other privately-owned electric-utility corporations,[1] doing business in and about the State of Missouri, joined as plaintiffs in filing suit in the United States District Court for the District of Columbia for injunctive, declaratory and other relief against certain officials of the United States Government responsible for the administration of the Rural Electrification Act of 1936, as amended,[2] 7 U.S.C.A. § 901 et seq., and Section 5 of the Flood Control Act of 1944, as amended,[3] 16 U.S.C.A. § 825s.

Plaintiffs, holders of non-exclusive franchises, engaged in the business of

---

[1] Since the suit was filed two of the plaintiff companies have been consolidated.

[2] Hereinafter referred to as the RE Act.
[3] Hereinafter referred to as the Flood Control Act.

generating, transmitting, distributing and selling electric power and energy at wholesale and retail to consumers in their respective territories, base their right to relief upon alleged violations of specific statutory provisions of the RE Act, supra, and the Flood Control Act, supra, by the Secretary of Agriculture and the Administrator of the Rural Electrification Administration (an agency of the Department of Agriculture[4]), and by the Secretary of the Interior and the Administrator of Southwestern Power Administration (an agency of the Department of the Interior[5]). The Secretary of the Treasury was also joined as a proper but not necessary party defendant.

Jurisdiction of the Court was invoked under the Court's general equity powers, under the Administrative Procedure Act, 5 U.S.C.A. §§ 1001–1009, and under the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202. Plaintiffs also pleaded the requisite jurisdictional amount.

It is alleged in the complaint that defendants[6], acting pursuant to a confederated plan, had conspired in concert with each other and with others, unknown to plaintiffs, to enter into a system of contracts between the United States and five federated rural electric cooperatives to enable SPA to acquire by the use of REA funds, without Congressional authorization and in violation of the law, steam or thermal generating capacity and transmission lines which would allegedly duplicate plaintiffs' facilities and thereby deprive plaintiffs of existing and potential customers and bring destructive competition to the plaintiff utilities and other privately-owned utilities operating in and adjacent to what is known as the Southwestern Power Area.

The complaint further alleges that defendants, as part of the conspiracy, had executed or were about to execute several contracts in each of which the Government (as represented by REA or by SPA) was or would be named as one party to the contract and one of the above-mentioned five federated rural electric co-operatives, namely, N. W. Electric Power Cooperative, Inc., Central Electric Power Cooperative, Sho-Me Power Corporation, KAMO Electric Cooperative, Inc., or M & A Electric Power Cooperative[7], was, or would be, named as the other party to the contract.

The federated cooperatives are privately owned corporations whose members consist of smaller rural electric distribution cooperatives. They are independent corporations organized under the laws of their respective States to enable the rural residents they serve to secure electric service as intended under the provisions of the RE Act. It is asserted by plaintiffs that the federated cooperatives are merely "paper organizations".

Plaintiffs' position is that defendants, through the REA and SPA, have conspired and combined to misuse their powers under the guise of the law and are merely using the cooperatives as conduits or nominees in an effort to build and to utilize a competing or public power generating and transmission system duplicating plaintiffs' facilities and invading plaintiffs' territories. This invasion, they assert, constitutes unlawful competition by defendants which has caused irreparable injury to plaintiffs jointly and severally.

Plaintiffs seek an injunction to restrain the Secretary of Agriculture and the Administrator of REA from making loans under the contracts severally executed between the Government through REA, and the five federated rural electric cooperatives in connection with the construction of electric gener-

---

4. The Rural Electrification Administration is hereinafter referred to as REA.

5. The Southwestern Power Administration is hereinafter referred to as SPA.

6. Term defendants does not include Secretary of the Treasury except when specially named.

7. Respectively referred to hereinafter as N. W., Central, Sho-Me, KAMO or M & A.

ating and transmission facilities; to restrain the Secretary of the Interior and the Administrator of SPA from proceeding under certain lease and power agreements entered into between the Government, acting through SPA, and the federated cooperatives; and to prevent the Secretary of the Treasury as custodian of the public funds of the United States from making any disbursements to the other defendants to enable them to carry out the unlawful acts set forth in the complaint.

Defendants seasonably moved to dismiss the complaint on the basic premise that plaintiffs had no standing to bring suit because no justiciable issue was presented to the Court. In making this motion, defendants relied strongly on the rule announced in Alabama Power Co. v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374. However, this branch of the Court then sitting in the Motions Division found that the petition raised the issue as to whether the sales and loans complained of and sought to be enjoined were sales and loans for an unlawful purpose in violation of the aforesaid statutes and denied the defendants' motion. The determination of the question of plaintiffs' special interests under the Declaratory Judgments Act and the Administrative Procedure Act was reserved to abide the presentation of evidence at the trial.

Answering, defendants then entered a general denial to all allegations of the complaint except the execution of the challenged contracts and formal allegations, and averred that all of the actions complained of were lawful and were taken pursuant to and in conformity with statutory authorization.

Later, another Judge of this Court heard and denied a motion by defendants for summary judgment. Subsequently, the case was specially assigned to this branch of the Court for the hearing of all motions, and for pre-trial and trial.

During an oral hearing of motions by plaintiffs and defendants for the production of documents under Rule 34 of the Federal Rules of Civil Procedure, 28 U.S.C. the desirability of a separate trial to determine the legality or illegality of the several contracts in the controversy, became apparent. In accordance with the provisions of Rule 42(b) of the Rules of Civil Procedure such separate trial was ordered, and has been held. This opinion is rendered with respect to the issue therein involved.

The contracts challenged, individually and as part of one of the five systems of contracts, are of three basic types, respectively denominated, (1) loan agreements or contracts, (2) lease-option contracts, and (3) power contracts. All agreements in a system were made in reference to one another.

By the terms of the loan contracts executed in the name of the United States by the REA, funds are to be advanced to the respective federated cooperatives for the construction of generating and transmission facilities (steam or diesel generating plants, transmission lines and related electrical facilities) e. g. see Plaintiffs' Exhibit 5 REA–NW Loan Contracts.

The loan agreements provide that before any funds are advanced to the respective cooperatives they must enter into the second type of agreement [8], namely the lease contract, with SPA, calling for the leasing to SPA for a period of 40 years of the transmission facilities to be constructed from the funds advanced. By the lease contracts SPA obtains control of the facilities for the 40-year period, and agrees to pay all costs of operation, maintenance, repair and capital replacements, as well as the amortization payments on the loans.

The loan agreements and lease contracts also call for the execution of the third type of agreement, the power contract which is entered into simultaneous-

---

**8.** The loan contracts also provide that the lease and power contracts must be approved by and pledged to the REA as security for the loans.

ly for the same 40-year period as provided in the lease contract. Under the power contracts SPA agrees to purchase the entire output of the steam plants constructed by the funds advanced in the loan agreements, and also agrees to resell power and energy to each of the cooperatives as its members require, at the rate designated in SPA's Rate Schedule "A", which rate schedule has been confirmed and approved by the Federal Power Commission. Thus, the loan contracts are conditioned on the execution of the agreements with SPA and the SPA agreements are made in contemplation of the loan agreements.

Plaintiffs contended that the contracts constitute the basis for a scheme or device by which defendants have endeavored to carry out an illegal plan.

In directing that a separate trial should be held for the purpose of determining the validity of the REA loans to the various federal cooperatives and the validity of the lease and power interchange agreements between the cooperatives and the SPA, the Court on May 19, 1952, entered an order containing the following:

"It Is Ordered and Directed

"That a separate trial of this cause be first had on the issue of the legality or illegality of said contracts.

\* \* \* \* \*

"Delineation of the Issue: The Court desiring to clarify the issue and the scope of testimony and other evidence admissible upon the separate trial in so far as may be reasonably and fairly possible in advance of trial, and being fully advised in the premises;

"It Is Hereby Ordered

"That no testimony or other evidence shall be received at the separate trial except testimony and other evidence which is relevant to the issue of the legality or illegality of one or more of the contracts in which the Government (as represented by REA or by SPA) is named

as one party to the contract and N. W. Electric Power Cooperative, Inc., Central Electric Power Cooperative, Sho-me Power Corporation, KAMO Electric Power Cooperative, Inc., or M & A Electric Power Cooperative, Inc., is named as the other party to the contract."

Following the pre-trial conference on June 16, 1952, an order was entered in which it was stated that the following contentions of plaintiffs "may be within the scope of the issue to be determined" at the separate trial:

"A. Plaintiffs contend that each of the contracts in which one of said cooperatives is named as one party and the Government (as represented by REA) is named as the other party, violate the Rural Electrification Act of 1936, as amended (hereafter called the 'RE Act') in one or more of the following respects:

"1. Said contracts severally provide or make available REA funds for the construction of electric facilities to serve persons in rural areas who, at the respective times when said contracts were severally negotiated and executed, were already receiving and are now receiving central station service.

"2. Said contracts severally provide or make available REA funds for the construction of substitute transmission lines and/or electric generating stations to serve persons in rural areas who, at the respective times when said contracts were severally negotiated and executed, were already receiving, and are now receiving, central station service.

"3. Said contracts severally provide or make available REA funds for the construction of electric facilities to serve persons in urban or non-rural areas.

"4. Said contracts severally provide or make available REA funds for the construction of transmission lines and electric generating facilities for the use and benefit of SPA, a federal agency.

"5. Under each of said contracts the REA funds are in substance and in law loaned to SPA.

"6. Under the contract in which M & A is named as one party and the Government (as represented by REA) is named as the other party, the REA funds were provided or made available to construct transmission lines for use by SPA to wheel power and energy to municipalities, industries and other SPA customers.

"B. Plaintiffs contend that each of the contracts in which one of the aforesaid cooperatives is named as one party to the contract and the Government (as represented by SPA) is named as the other party to the contract, violates Section 5 of the Flood Control Act of 1944 (as amended) (hereinafter sometimes called the 'Flood Control Act') in one or more of the following respects:

"1. Under said contracts, SPA would borrow REA funds for which no authority has been granted to SPA.

"2. Under said contracts SPA would acquire transmission lines for the acquisition of which the Congress has neither made an appropriation nor found any necessity.

"3. Under said contracts SPA would, in substance and in law, acquire steam electric generating stations for the acquisition of which the Congress had not granted, and has refused to grant, any authority.

"4. In the alternative, SPA, under said contracts, would purchase electric power and energy for commercial resale to the public for doing which SPA has no authority.

"10. If the Flood Control Act of 1944 or any other statute were construed as authorizing SPA to acquire steam electric generating stations or to purchase power and energy for commercial resale to the public, then said statute or statutes would to that extent be void as in excess of any constitutional authority of the United States.

"C. Plaintiffs also contend that said contracts simultaneously violate both the RE Act and the Flood Control Act and are otherwise illegal in that REA funds would be used by defendants Brannan, Wickard, Chapman and Wright to by-pass the Congress and to enable SPA to circumvent the limitations imposed by the Congress upon the electric utility operations of SPA." [8A]

On October 13, 1952, the cause proceeded to trial upon the restricted issue. During the three-week period of trial expert testimony and numerous exhibits were presented on both sides to substantiate the respective claims and allegations of the parties.

From the evidence the following major questions appear to have developed.

1. Whether the loan contracts violate the central station service provision of the RE Act. 7 U.S.C.A. § 904.

2. Whether the loan contracts violate the rural area provision of the RE Act. 7 U.S.C.A. § 904.

3. Whether the loan contracts were executed for the sole benefit of SPA.

4. Whether the loan contracts violate the self-liquidating provision of Section 4 of the RE Act. 7 U.S.C.A. § 904.

5. Whether the loan contract with M & A is illegal because of the SPA and M & A contracts.

6. Whether the lease and power contracts violate the provisions of the Flood Control Act. 16 U.S.C.A. § 825s.

7. Whether the lease and power contracts are illegal on any other ground.

These questions will be discussed in the above-numbered order:

8A. See Court Order of June 11, 1953 ordering substitution of certain parties defendant.

1. Whether the loan contracts violate the central station service provision of the RE Act. 7 U.S.C.A. § 904.

Plaintiffs first contend that by means of loan agreements REA undertakes to loan REA funds to construct electric facilities to serve persons in rural areas where central station service is not only available but where, in many cases, it is presently received. In this regard, the position of plaintiffs is that where, as in the case at bar, a private utility supplies power and energy to a federated cooperative which in turn meets the needs of its respective members by furnishing them with current over distribution systems initially financed by an REA loan, the purpose of the RE Act is fulfilled and that any further loans to any of the cooperatives constitute a violation of the central station service provision. Plaintiffs' position appears to be based upon the premise that central station service as contemplated in the Rural Electrification Act is thus being received by the rural area supplied by this distribution system as well as by the federated cooperative. With this postulate the Court is unable to agree. The Court's attention has not been directed to anything in the background or history of the statute which would in the Court's judgment require the narrow construction which plaintiffs contend is applicable.

Although plaintiffs apparently have no quarrel with the practice under which the Administrator has made loans for the construction of distribution lines which meet the present requirements of only certain rural residents in an area, they do challenge the REA practice of making successive loans to the cooperatives over a period of years which would enable the borrowers to construct an electrical system to meet the increasing power requirements of its members, who are presently being served, as well as to supply the demand for service from new consumers in the surrounding area who would be denied such service, except for the assistance of the REA.

In this connection it must be borne in mind that the RE Act of 1936, as its name implies, was legislation designed to carry into effect a governmental policy by means of which the benefits of electrical energy and accompanying electrical facilities might be made readily available, as they had not, hitherto, been so made available, to individuals in rural areas. It was designed to remedy a deficiency in the life and economy of the rural population of the nation. Arkansas Valley Co-operative Rural Electric Co. v. Elkins, 1940, 200 Ark. 883, 141 S.W.2d 538. Consequently, the Court has not been persuaded that it was intended that rural residents, upon receiving an RE loan, should be barred from further participation in the advantages and opportunities offered in the RE program. Moreover, in the opinion of the Court, there is nothing in the language of the Act to require that the Administrator's authority to finance the construction of generating plants and transmission lines must be exercised simultaneously with his power to finance the construction of distribution lines to furnish electric energy to unserved persons in rural areas.

 It is a well-recognized principle of statutory construction that the terms of a statute should be construed so as to effectuate the legislative intent. Mr. Justice Reed, speaking for the Supreme Court upon this phase of statutory interpretation, has said: "There is no invariable rule for the discovery of that intention. To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute [9] * * *."

9. " * * * when the plain meaning [of the words used does] not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed [the] purpose [of the Act], rather than the literal words. When aid to construction of the meaning of words,

"The meaning to be ascribed to an Act of Congress can only be derived from a considered weighing of every relevant aid to construction[10]." Although the interpretation of an Act of Congress by those charged in large measure with administering the Act is not conclusive, it is, nevertheless, entitled to persuasive weight.[11]

 Sec. 4 of the RE Act[12] authorizes the Administrator "to make loans for rural electrification * * * for the purpose of financing the construction * * * of generating plants, electric transmission and distribution lines or systems for the furnishing of electric energy to persons * * * who are not receiving central station service * * *." Under the terms of this section the Administrator is empowered to authorize loans for four separate and distinct purposes to rural residents who qualify under the Act. The Administrator may authorize loans for the construc-

as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" See United States v. American Trucking Associations, 1940, 310 U.S. 534, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345, per Justice Reed for comprehensive discussion on judicial function in interpretation of statutes and numerous authorities cited therein. 310 U.S. at pages 542–545, 60 S.Ct. at page 1063.

10. United States v. Dickerson, 1940, 310 U.S. 554, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356.

11. United States v. American Trucking Associations, supra; Skidmore v. Swift & Co., 1944, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124; Billings v. Truesdell, 1944, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917; Overnight Motor Transportation Co. v. Missel, 1942, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682.

12. Section 4 of the RE Act provides:
"The Administrator is authorized and empowered, from the sums hereinbefore authorized, to make loans for rural electrification to persons, corporations, States, Territories, and subdivisions and agencies thereof, municipalities, peoples' utility districts and cooperative, nonprofit, or limited-dividend associations, organized under the laws of any State or Territory of the United States, for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing of electric energy to persons in rural areas who are not receiving central station service, and loans, from funds available under the provisions of sections 903(d) and 903(e) of this title but without regard to the 10 per centum limitation therein contained, to cooperative associations and municipalities for the purpose of enabling said cooperative associations and municipalities to the extent that such indebtedness was incurred with respect to electric transmission and distribution lines or systems or portions thereof serving persons in rural areas, to discharge or refinance long-term debts owed by them to the Tennessee Valley Authority on account of loans made or credit extended under the terms of sections 831–831c and 831d–831dd of Title 16: PROVIDED, That the Administrator, in making such loans, shall give preference to States, Territories, and subdivisions and agencies thereof, municipalities, peoples' utility districts, and cooperative, nonprofit, or limited-dividend associations, the projects of which comply with the requirements of this chapter. Such loans shall be on such terms and conditions relating to the expenditure of the moneys loaned and the security therefor as the Administrator shall determine and may be made payable in whole or in part out of the income: Provided further, That all such loans shall be self-liquidating within a period of not to exceed thirty-five years, and shall bear interest at the rate of 2 per centum per annum; interest rates on the unmatured and unpaid balance of any loans made pursuant to this section prior to September 21, 1944, shall be adjusted to 2 per centum per annum, and the maturity date of any such loans may be readjusted to occur at a date not beyond thirty-five years from the date of such loans: And provided further, That no loan for the construction, operation, or enlargement of any generating plant shall be made unless the consent of the State authority having jurisdiction in the premises is first obtained. Loans under this section and section 905 of this title shall not be made unless the Administrator finds and certifies that in his judgment the security therefor is reasonably adequate and such loan will be repaid within the time agreed." 7 U.S.C.A. § 904.

tion of (1) generating plants, (2) transmission lines, (3) distribution lines, and (4) electrical systems.[13]

· The exercise of any one of the first three above enumerated powers, in the Court's opinion, does not exclude the others and does not prevent the concurrent or consecutive (later) exercise of another loan in connection with the development of a prior authorization. To construe the language otherwise would defeat the obvious purpose of the statute and would nullify, in most instances, the authority delegated by Congress, for, as a practical matter, Congress has repeatedly been advised and informed of REA policy and practice and has consistently given its approval to the administrative interpretation of the REA officials and others. Therefore, for the reasons stated above, the Court is unable to conclude that the determination made by the Administrator based upon his specialized experience and information to the effect that repeated loans, each of which, like the original loan, was made for the single ultimate purpose of supplying electrical service to persons under the circumstances existing in connection with the loans involved, is in conflict with the powers delegated to his office by Congress to make loans "to persons * * * who are not receiving central station

service * * *." Consequently, the Court finds that the course pursued by the Administrator in authorizing the loans under discussion under this heading is not violative of the Act,[14] and that the loan contracts do not violate the central station provision of the RE Act.

2. Whether the loan contracts violate the rural area provision of the RE Act. 7 U.S.C.A. § 904.

 Next, plaintiffs contend that Congress did not authorize and consequently prohibited the making of loans to finance the construction of facilities to serve municipalities having a population in excess of 1500 inhabitants. Plaintiffs' argument is directed at the acquisition by the Sho-Me Cooperative of an existing electric system with REA funds. This system was already providing service to certain small municipalities with populations in excess of 1500 inhabitants and was acquired by Sho-Me in order to extend service to surrounding unserved rural areas as a part of Sho-Me's overall integrated system which is concededly of rural design. By the language of Section 4 of the RE Act[15] the Administrator is empowered to make loans "for the purpose of financing" electric facilities to furnish electric energy "to persons in rural areas". The term "rural

---

13. Electrical systems would necessarily consist of a combination of one or two, or all three of the facilities enumerated, namely, (1) generating plants, (2) transmission lines, and (3) distribution lines.

14. Cf. "While the interpretative bulletins are not issued as regulations under statutory authority, they do carry persuasiveness as an expression of the view of those experienced in the administration of the Act and acting with the advice of a staff specializing in its interpretation and application." Overnight Motor Transportation Co., Inc., v. Missel, supra, 316 U.S. 580, 62 S.Ct. 1221, note 17.
"The Treasury promptly interpreted the Act to apply to all first processings after its effective date. * * * This action of the Treasury, with its wide experience in tax matters, has weight in our conclusion * * *." Colgate-Palmolive-Peet Co. v. United States,

1944, 320 U.S. 422, 426, 64 S.Ct. 227, 230, 88 L.Ed. 143.
"Undoubtedly questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the judgment of those whose special duty is to administer the questioned statute." National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 130–131, 64 S. Ct. 851, 860, 88 L.Ed. 1170.
"* * * the rulings, interpretations and opinions of the Administrator * * *, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore v. Swift & Co., supra, 323 U.S. at 140, 65 S.Ct. at page 164.

15. See note 12.

area" is later defined in Section 13 of the Act as "any area of the United States not included within the boundaries of any city, village, or borough having a population in excess of fifteen hundred inhabitants, and such term shall be deemed to include both the farm and nonfarm population thereof; * * * ." 7 U.S.C.A. § 913.

Defendants contend that the above acquisition is justified because it is merely incidental and contributory to the essential statutory purpose of Section 4 of the Act by making possible the service of electric power to a considerable number of unserved persons in rural areas.

Congress in enacting the RE Act was obviously motivated by a desire to provide electrical service and its consequent benefits to rural residents, who, because of economic conditions and other factors, were thwarted in their attempts to secure such service by their own efforts. Thus, in the light of the purpose the legislation seeks to accomplish, the practical objectives of the enactment bring the RE Act within the realm of remedial legislation and afford persuasive evidence that Congress did not intend that a narrow interpretation of the Act should be applied by the Courts. Since the statute is primarily remedial in character, its provisions must be construed practically and realistically, taking into consideration the intention of Congress,[16] in order that effect may be given to the purposes for which the statute was enacted and the ends sought to be attained.[17] Bearing in mind these considerations, the Court is of the opinion that a proper construction of the Act does not prohibit the challenged acquisition where, as here, the record shows a substantial number of persons, in rural areas, who are now unserved, will be served as a consequence of the loan. Hence, the Court holds that the contracts under consideration under this heading do not violate the rural area provision of the RE Act.

3. Whether the loan contracts were executed for the sole benefit of SPA.

Plaintiffs further allege that REA seeks by "mere words and ingenuity of contractual expression[18]" to make it appear that the loans provided for in the contracts entered into by REA with the federated cooperatives (M & A excepted[19]) are not for the benefit of the cooperatives but are in reality for the sole benefit of SPA. In support of this allegation plaintiffs point to the contractual provisions of the various loan agreements showing that the entire cost of constructing the electrical facilities will be advanced by REA only when the lease and power contracts executed by SPA with the cooperatives have been approved by and pledged to REA. Plaintiffs also note that the contracts provide that each cooperative shall pay over to the REA all funds received from SPA. They assert, in the premises, that there is no financial responsibility imposed upon the cooperatives because, under the terms of the lease and power contracts,

---

16. REA Administrative Bulletin, issued December 11, 1944, Defendants' Exhibit 108; REA Administrative Bulletin No. 62, issued June 9, 1950, Defendants' Exhibit 109; Letters from Comptroller General, Defendants' Exhibits 104, 105, 106.

17. Cf. United States v. Silk, 1947, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757; National Labor Relations Board v. Hearst Publications, supra; United States v. American Trucking Associations, supra; South Chicago Coal & Dock Co. v. Bassett, 1940, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732; Warner v. Goltra, 1934, 293 U.S. 155, 55 S.Ct.

46, 79 L.Ed. 254; Baltimore & Philadelphia Steamboat Co. v. Norton, 1932, 284 U.S. 408, 52 S.Ct. 187, 76 L.Ed. 366; Robinson v. Bradshaw, D.C.Cir., 206 F. 2d 435; Grace v. Magruder, 80 U.S. App.D.C. 53, 148 F.2d 679, certiorari denied, 1945, 326 U.S. 720, 66 S.Ct. 24, 90 L.Ed. 426; United States v. Vogue, Inc., 4 Cir., 1944, 145 F.2d 609.

18. United States v. City and County of San Franscisco, 1940, 310 U.S. 16, 28, 60 S.Ct. 749, 756, 84 L.Ed. 1050.

19. Plaintiffs do not contend that the REA–M & A loan contract is illegal on this ground but assert it is illegal on another ground which is discussed infra.

SPA acquires all the rights and benefits incident to the loan and agrees to assume all the burdens consistent with beneficial ownership of the facilities. This, they contend, demonstrates that SPA is the real party in interest which is bound to repay the funds advanced by REA and that the federated cooperatives are merely being used as conduits or nominees by SPA. They contend that the RE Act does not authorize and consequently prohibits loans by REA to another governmental agency and ask the Court to look beyond the form and language employed in the loan contract in determining the question of its legality.

Although the issue presented has numerous facets, it is relatively simple when viewed in the light of the objectives which the separate trial was designed to accomplish. The basic question throughout the separate trial has been whether the defendants were acting within the scope of their authority in executing the various contracts. All other issues were swept aside by the Court's order of May 19, 1952. The Court is well aware that in concluding that a separate trial should be ordered, it was indicated that the Court might not limit itself entirely to a consideration of the contracts themselves. But subsequently, on more than one occasion, during the course of these proceedings the Court has expressed its views on the test to be applied in this matter. The Court throughout has indicated its intention to lay the contracts down beside the applicable statutes and to determine whether the contracts come within the scope of the statutes, and are authorized by the provisions thereof. In other words, it was the Court's expressed intention to regard and consider the contracts face to face with the applicable statutes as related to the contentions of the plaintiffs, to ascertain simply whether there was statutory authority to permit the defendants to take the actions they have taken.

After a careful review of the record the Court is unable to say that the defendants have misused their powers. It is obvious that REA has the authority to make the challenged loans to the cooperatives. Nothing contained in the present record precludes such a finding. It is also obvious that it is the cooperatives who are obligated to repay their debt. In reaching this conclusion, the Court is not being oblivious to the difficulties the cooperatives may encounter in carrying out their responsibilities should a termination occur, as contemplated in the lease and power agreements with SPA. However, such a termination in no way affects the obligations of the cooperatives to the REA. The fact remains that the loans must still be repaid by the cooperatives.

The Court is not persuaded, as contended by the plaintiffs, that SPA has entered into any obligation with REA. There is nothing to indicate that SPA has received any of the proceeds from the loans, nor has SPA guaranteed repayment of the loans. The whole situation has not created any enforceable obligation on the part of SPA toward REA. Thus, it cannot be said that the contracts between SPA and the cooperatives have become transformed into anything other than or differing from that which they appear on their face to be, namely, loan contracts between REA and the cooperatives, which, as above stated, are within the statutory authority of REA to make.

Moreover, in the Court's opinion, it is significant that the federated cooperatives have also assigned to the REA the unconditional contracts under which the member cooperatives are obligated to purchase their power requirements from the federated cooperatives during the period when the loans are to be repaid.[20] These obligations clearly place the cooperatives in the position of the real borrower, for they conclusively bind the assets of all recipients to the repayment of the advanced funds. These facts, in themselves, and regardless of congressional appropriations, plainly show that the plaintiffs have failed to sustain the

20. Plaintiffs' Exhibits 5C and 9.

burden thrust upon them when they filed their complaint. Under the circumstances, the Court concludes that the federated cooperatives are the real borrowers and true beneficiaries of the loan agreements. Consequently, the Court holds that the loan contracts involved under this heading were not executed for the sole benefit of SPA.

4. Whether the loan contracts violate the self-liquidating provision of Section 4 of the RE Act. 7 U.S.C.A. § 904.

■■ As required by law, the Administrator of the REA before making the contested loans found and certified that the security was "reasonably adequate",[21] and that the loans would be repaid within the proper period. However, the plaintiffs urge that the loans do not comply with the provision of Section 4 "that all such loans shall be self-liquidating." Plaintiffs, in their brief, state that "the certificates were necessarily and concededly predicated upon SPA's agreement in the Lease Option and Power Contracts (pledged to secure the REA loan) to make minimum monthly payments which would amortize the REA loans" and that "to be self-liquidating within the meaning of the Act, the federal funds loaned by REA must be liquidated or repaid from sources other than the Federal Government itself." The predicate of this position is the assumption, previously indulged by the plaintiffs, that the loans were made to and for the benefit of SPA, and that the obligation to repay these loans rests on SPA. The Court finds itself unable to agree with this position. Nor does the Court find support for the assumption or for the contention, either from the wording of the contract or from the result of its actual application as reflected in the record. Furthermore, it is well settled that courts do not direct or control the judgment of administrative officers in matters properly within their jurisdic-

tion, except in clear cases of illegality of action.[22] "It is a fundamental principle * * * that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.'" American Power & Light Co. v. Securities & Exchange Commission, 1946, 329 U.S. 90, 112, 67 S.Ct. 133, 146, 91 L.Ed. 103. The Court, in the circumstances, finds and consequently holds that the loan contracts in question are not violative of the self-liquidating provision of Section 4 of the RE Act.

5. Whether the loan contract with M & A is illegal because of the SPA and M & A contracts.

■ Plaintiffs further contend that the loan contract between REA and M & A is illegal because "the RE Act does not authorize, and consequently prohibits the making of loans for the construction of facilities to supply power to or to wheel power for SPA." However, the evidence of the separate trial refutes this contention. The record shows that the loan was made several years prior to the SPA–M & A agreements in order that member cooperatives of M & A might be served. Later, M & A entered into the contract with SPA for the purpose of providing for the sale of its off peak power and permitting its incidental transmission capacity to be utilized to wheel power and energy for SPA.

The defendants take the position that in designing the facilities to meet the power requirements of the cooperatives it was necessary that the engineers be concerned with such factors as increase of operating capacity, increase of reserve capacity, and load growth. Consequently, they contend that in making provision for such factors in connection with service to cooperatives, it was inevitable that incidental capacity should become avail-

21. See certificate attached to Plaintiffs' Exhibit 5D.
22. Marbury v. Madison, 1803, 1 Cranch 137, 2 L.Ed. 60; State of Louisiana v. McAdoo, 1914, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506. See Proctor & Gamble Co. v. Coe, 1938, 68 App.D.C. 246, 96 F.2d 518 and cases there collected.

able, and that the use of such incidental capacity to safeguard the assets of the cooperatives until such time as they could utilize and economically justify the plant's operation for their own requirements is not prohibited by the RE Act. Plaintiffs take a directly opposite position. Justification for REA practice and policy, relied on by the defendants in respect of the use of this incidental capacity to reduce the cost of service to cooperatives by more efficient use of the facilities involved during the period of development finds support in the record. Applying to this policy and practice the test as to whether it is violative of the RE Act, the Court is unable to find that the means selected to carry out the purposes of the Act is illegal either as prohibited by said Act or as exceeding authority therein contained. Only when "the remedy chosen is unwarranted in law or is without justification in fact should a court attempt to intervene in the matter." American Power & Light Co. v. Securities & Exchange Commission, supra. The Court holds that the loan contract between REA and M & A is a legal contract.

6. Whether the lease and power contracts violate the provisions of the Flood Control Act.

 Emphasis is laid by the plaintiffs upon their charge that the lease and power contracts entered into by SPA in the name of the United States with the various federated cooperatives are illegal on the ground that they are not authorized and consequently are forbidden by the Flood Control Act.[23] Plaintiffs argue that SPA has no authority to acquire or construct with borrowed funds the leased facilities. Since, as previously stated, the Court does not accept the premise contended for by the plaintiffs, that SPA is the real borrower of the REA funds, it follows that said argument merits further consideration only insofar as it concerns defendants' claim of acquisition of these facilities by SPA. Plaintiffs have diligently and carefully developed a showing in the record upon which they rely in support of their contention that these facilities have in fact been acquired by SPA. Plaintiffs allege and have introduced evidence to substantiate their allegation that SPA has acquired all rights and benefits and assumed all burdens incident to outright ownership of the facilities. From their witnesses the Court has heard detailed testimony that the many rights reserved and duties assumed under the contracts by SPA are, respectively, rights normally reserved and duties normally assumed by the constructing utility or by the purchaser of the facilities. On the other hand, defendants have produced evidence

23. Section 5 of the Flood Control Act provides:

"Electric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Federal Power Commission. Rate schedules shall be drawn having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric energy, including the amortization of the capital investment allocated to power over a reasonable period of years. Preference in the sale of such power and energy shall be given to public bodies and cooperatives. The Secretary of the Interior is authorized, from funds to be appropriated by the Congress, to construct or acquire, by purchase or other agreement, only such transmission lines and related facilities as may be necessary in order to make the power and energy generated at said projects available in wholesale quantities for sale on fair and reasonable terms and conditions to facilities owned by the Federal Government, public bodies, cooperatives, and privately owned companies. All moneys received from such sales shall be deposited in the Treasury of the United States as miscellaneous receipts." 16 U.S.C.A. § 825s.

that the foregoing reservations of rights and assumptions of duties by defendants are equally consistent with the position of lessee of the facilities, which position they contend they occupy.

The Court is asked by plaintiffs to hold that the lease agreement creates, in practical operation, a situation which causes SPA to become purchaser, rather than lessee, of the facilities covered by the agreement. In other words, plaintiffs present the question of fact as to whether, by virtue of the contract, SPA becomes the owner or lessee of the facilities involved. The burden of proof, of course, rests on plaintiffs to establish that SPA, in the circumstances, becomes the owner under the contract. Upon consideration of the conflicting evidence on this question in the record, the Court finds itself unable to conclude that plaintiffs' have met the burden of proof on this issue. The impressive testimony of plaintiffs highly qualified witnesses does not, in the Court's view, alter the fact that the practical operations pursuant to the agreement are consonant with the leasing arrangement as set forth in the written instrument and are, at least, as consistent with such arrangement as with the sale arrangement contended for by the plaintiffs. In the circumstances, considering plaintiffs' failure to meet the burden of proof imposed upon them, the Court concludes that the lease agreement does not create a situation in which SPA becomes purchaser rather than lessee of the facilities involved.

The Court is of the opinion that the language of the statute justifies a holding that the Secretary of the Interior, through his marketing agent, may acquire by a lease agreement such transmission lines as may be necessary in order to accomplish the objectives of the Act. Within the authority of the Secretary "to construct or acquire, by purchase or other agreement," is embraced,

in the Court's opinion, not only the power of acquisition by purchase, but also the power of acquisition by lease agreement. Not only is this conclusion justified by the wording of the Act, but, in view of the context, any other conclusion would thwart the proper exercise of authority reposed in the Secretary of the Interior.

In connection with the foregoing, the Court has also taken into consideration the question raised by plaintiffs as to whether the leasing of these facilities is "necessary" within the meaning of the Act. It would appear that the answer to this question, initially, must be determined administratively since Congress has imposed upon the administrative agency involved the duty to "transmit and dispose of * * * power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles". The Court finds that there is warrant in the record and reasonable basis in law for the Administrator's determination of the means to be adopted, that is to say, the leasing of transmission lines and accompanying facilities, for the carrying out of the Congressional mandate contained in the Act. Consequently, the Court holds that the leasing of these facilities is "necessary" within the terms of the Act.[24]

In like manner it is clear to the Court, in view of the rule laid down in Ashwander v. T. V. A.,[25] that the purchase of thermal energy generated at the steam plants of the cooperatives, which purchase is reasonably incidental to the integration of hydroelectric power generated at the Reservoir Projects, is not prohibited by the provisions of the Flood Control Act but rather is within the scope of its provisions and in accord with its purpose. Consequently, the Court finds that authority to purchase

24. See, American Power & Light Co. v. Securities & Exchange Commission, supra. Ashwander v. Tennessee Valley Authority, 1936, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688.

25. Ashwander v. Tennessee Valley Authority, supra, note 24. See infra 7 [115 F.Supp. 418].

power and to pay rentals for the use of transmission facilities by SPA is contained in the terms of the Flood Control Act. The Court holds, therefore, that the lease and power contracts do not violate the provisions of the Flood Control Act.

7. Whether the lease and power contracts are illegal on any other ground.

■ Also pressed upon the Court are the following contentions: that the so-called Continuing Fund Statute, 16 U.S.C.A. § 825s–1, contains no authority under its terms for the execution of the lease and power contracts by SPA[26]; that the lease and power contracts are illegal in that they circumvent the limitations imposed by Congress upon the operations of SPA; and that if any statute is construed as authorizing the operations undertaken by SPA, such statute or statutes would be unconstitutional. The Court does not find itself in agreement with these contentions.

In the Court's opinion the record supports the conclusion that the Continuing Fund Statute and the various Interior Department Appropriation Acts demonstrate that Congress, from time to time, has appropriated funds for the purchase of power and the rental of transmission facilities by SPA. Thus, it may be said that there is expressed in the Continuing Fund Statute what was previously implicit in the Flood Control Act. The Continuing Fund Statute, as the Court construes it, is in effect an amendment to the Flood Control Act.

Since it has been previously shown that the operations of SPA are in accordance with the Congressional mandate,[27] it is apparent that the contracts do not circumvent the limitations imposed by Congress upon the electric utility operations of SPA.

■ Finally, as to the constitutional argument presented by the plaintiffs, the Court concludes that same is resolved by the rule announced in the Ashwander case. There the stockholders of the Alabama Power Co. sought unsuccessfully to challenge a contract between the Power Company and the Tennessee Valley Authority, an agency of the Federal Government, as injurious to the interests of the corporation and beyond the constitutional powers of TVA. The contract provided in part for (1) the purchase by TVA from the Power Company of transmission lines, substations, and other properties, (2) an interchange of hydroelectric energy, and (3) the sale by the TVA to the Power Company of its "surplus power."

As in the case at bar, the petitioners there based their attack on the contract on the contention that constitutional authority had been exceeded by the acquisition of the properties and by the execution of the interchange agreement.

26. The so-called Continuing Fund Statute provides:

"All receipts from the transmission and sale of electric power and energy under the provisions of section 825s of this title, generated or purchased in the southwestern power area, shall be covered into the Treasury of the United States as miscellaneous receipts, except that the Treasury shall set up and maintain from such receipts a continuing fund of $300,000, including the sum of $100,000 in the continuing fund established under the Administrator of the Southwestern Power Administration in the First Supplemental National Defense Appropriation Act, 1944 (57 Stat. 621), which shall be transferred to the fund established; and said fund of $300,000 shall be placed to the credit of the Secretary and shall be subject to check by him to defray emergency expenses necessary to insure continuity of electric service and continuous operation of the facilities, and to cover all costs in connection with the purchase of electric power and energy and rentals for the use of facilities for the transmission and distribution of electric power and energy to public bodies, cooperatives, and privately owned companies; Provided, That expenditures from this fund to cover such costs in connection with the purchase of electric power and energy and rentals for the use of facilities are to be made only in such amounts as may be approved annually in appropriation Acts." 16 U.S.C.A. § 825s–1, Act of Aug. 31, 1951, amended this section by adding this proviso.

27. See supra, 6 [115 F.Supp. 416].

Nonetheless, the Supreme Court found no constitutional limitation to prevent the acquisition of the transmission lines, although, it was noted, the lines were not essential to the sale of the surplus power, and the Court approved the interchange of energy arrangement as a means of accomplishing the disposition of its own power.

The significance of the Supreme Court's ruling in the Ashwander case to the case at bar is shown from the following language of Chief Justice Hughes:

"As to the mere sale of surplus energy, nothing need be added to what we have said as to the constitutional authority to dispose. The government could lease or sell and fix the terms. * * * The contemplated interchange of energy is a form of disposition, and presents no questions which are essentially different from those that are pertinent to sales.

"The transmission lines which the Authority undertakes to purchase from the Power Company * * * provide the means of distributing the electric energy * * * to a large population. They furnish a method of reaching a market. * * We know of no constitutional ground upon which the federal government can be denied the right to seek a wider market. * * * The transmission lines for electric energy are but a facility for conveying to market that particular sort of property, and the acquisition of these lines raises no different constitutional question". 297 U.S. at pages 338, 339, 56 S.Ct. at page 479.

Plaintiffs have cited numerous authorities in support of the constitutional argument but no case aside from the Ashwander decision has been brought to the attention of the Court directly supporting the position taken by either side. The Court does not believe any good purpose would be served in reciting and distinguishing the authorities submitted and, in the circumstances, does not feel

called upon to attempt such an undertaking. It is sufficient to say that in many, if not most, instances the Court does not dispute the principles enunciated in those decisions but is unable to find that they are applicable to the facts in the case at bar, or that they serve to modify the above rule announced in the Ashwander case.

The Court finds no ground asserted under heading 7 for holding the lease and power contracts illegal.

Counsel for the defendants will prepare findings of fact, conclusions of law, and judgment in accordance with this opinion.