**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**SACRAMENTO MUNICIPAL UTILITY
DISTRICT, Defendant-Appellant.**

**No. 79–4507.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 1981.

Decided Aug. 13, 1981.

David S. Kaplan, Sacramento, Cal., for defendant-appellant.

Robert Fullerton, Western Area Power, Golden, Colo., argued, for plaintiff-appellee; Herman Sillas, U.S. Atty., Sacramento, Cal., on brief.

Before FLETCHER and NELSON, Circuit Judges, and KEEP*, District Judge:

KEEP, District Judge:

The United States of America brought this action for declaratory relief, seeking judicial interpretation of its contract with the Sacramento Municipal Utilities District (SMUD). The district court granted summary judgment in favor of the government ruling that 1) the contract was clear and unambiguous on its face and thus extrinsic evidence was inadmissible; 2) the interpretation urged by SMUD would restrict Congress' plenary power to define the scope of the Central Valley Project and therefore would be illegal. SMUD appeals.

We find that the contract is not unambiguous on its face and thus extrinsic evidence is admissible if relevant to determine if there is a genuine issue of material fact with regard to the meaning of the contract.

---

* Honorable Judith N. Keep, United States District Judge, Southern District of California, sitting by designation.

Further, we find the interpretation of the contract urged by SMUD does not produce an illegal result in that it does not unlawfully intrude on Congress' plenary power to define the scope of the Central Valley Project. Accordingly, we reverse and remand the case to the district court for reconsideration.

## FACTS

In 1952, the United States, through the Bureau of Reclamation, Department of the Interior, entered into a contract to sell electrical power to SMUD. Under the terms of the contract, which were revised in 1954, the government agreed to sell quantities of hydro-electric power from the Central Valley Project in Northern California, subject to a rate formula based on the following: 1) costs incurred in operating and maintaining Project facilities; and 2) other costs recoverable under Federal Reclamation Law in effect in 1954. The contract also permitted the recovery of costs which are not relevant to this appeal.

In 1964, Congress authorized the Secretary of Interior to import power from the Pacific Northwest for use in California. Pursuant to this congressional mandate, the government contracted in 1967 to buy thermo-electric power from a non-federal coal-fired plant in Centralia, Washington, and to import this power into the Central Valley Project. The amount of power allocated to SMUD under the contract was not increased after the arrangements for the pur-

chase of Centralia power were made, although allocations to many other Central Valley Project customers have risen accordingly.

In 1974, the government increased Central Valley Project rates to reflect, in part, the costs of buying and importing power from Centralia. SMUD refused to pay and the government sued for declaratory relief seeking judicial interpretation of its contract with SMUD.[1]

Before us is the propriety of the district judge's ruling granting a motion for summary judgment in favor of the government as to the first cause of action.[2]

## DISCUSSION

### A. Standard of Review

The role of the appellate court in reviewing a grant of summary judgment is to determine whether there is any genuine issue of material fact underlying the adjudication, and, if there is none, to determine whether the substantive law was correctly applied. *Yazzie v. Olney, Levy, Kaplan & Tenner*, 593 F.2d 100, 102 (9th Cir.1979); *Inland Cities Express Inc. v. Diamond National Corp.*, 524 F.2d 753, 754 (9th Cir. 1975). The inferences to be drawn from the underlying facts must be reviewed in the light most favorable to the party opposing the motion. *United States v. Diebold Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

 Whether a contract is ambiguous is a question of law, freely reviewable by

---

1. Initially, the government filed a collection action. SMUD answered by challenging the propriety of the rate increase. Shortly thereafter, the Central Valley Project's 1974 rate increase was declared invalid in a case brought by another Central Valley customer on procedural grounds. *See Northern California Power Agency v. Morton*, 396 F.Supp. 1187 (D.D.C.1975), *aff'd sub nom. Northern California Power Agency v. Kleppe*, 539 F.2d 243 (D.C.Cir.1976). SMUD moved for summary judgment on collateral estoppel grounds. In response, the government filed an amended complaint adding a cause of action for declaratory relief for judicial interpretation of its contract with SMUD. Later amendments to the government's com-

plaint resulted in deletion of the collection claim and refinement of the request for declaratory relief in four causes of action, including a subsequent claim based on a similar 1978 rate increase.

2. A motion for reconsideration was denied. The remaining causes of action were dismissed upon stipulation of settlement between the parties. Judgment in the case was therefore entered by the district court on the basis of its order granting summary judgment for the government on the first cause of action. SMUD appeals from that final judgment.

the appellate court. *United States ex rel. Union Building Materials Corp. v. Haas & Haynie Corp.*, 577 F.2d 568, 572 (9th Cir. 1978); *United States ex rel. White Masonry Inc. v. F.D. Rich Co.*, 434 F.2d 855, 858 (9th Cir.1970). If the appellate court determines that the contract is unclear, ordinarily summary judgment is improper as differing views of the intent of parties will raise genuine issues of material fact. *Freeman v. Continental Gin Co.*, 381 F.2d 459, 465 (5th Cir.1967).

B. *The contract is not unambiguous on its face regarding the right of the government to recover the cost of importing Centralia power.*

■ In support of its decision that there was no issue of fact as to whether the costs of importing Centralia power are properly recoverable by the government under the contract, the district court found that the relevant provisions of the agreement were clear and unambiguous. In so doing, the court ruled inadmissible SMUD's proffered extrinsic evidence of the parties' intent pursuant to the parole evidence rule.

In his findings, the district judge did not state which contract provision clearly and unambiguously provided for the recovery of the cost of purchased power.[3] Therefore, this court may affirm the district court's decision on appeal based on any clause we find which plainly allows for the recovery of such expenses. *Paskaly v. Seale*, 506 F.2d 1209, 1211 n.4 (9th Cir.1974). Each of the relevant provisions will be discussed separately below.

### (1) "Operation and Maintenance Expenses"

Article 5(b) of the contract establishes rates for the sale of power; it reads in pertinent part:

The schedule of rates and charges shall be subject to review and modification . . .

in accordance with any changes made in the United States' schedule of rates and charges for the sale of Project firm power for resale, and any such charges shall establish a level of rates and charges to produce revenue which, considered together with all other revenue, from the sale or disposition of all other Project power, is not in excess of that required:

. . . (i) to defray the annual *operation and maintenance expenses of the Project* . . . (Emphasis added).

Article 1(a) of the contract defines "Project" as follows:

The electric power facilities of the Central Valley Project, California, as now and hereafter authorized by the Congress of the United States, or pursuant to Acts thereof, including that portion of multipurpose facilities properly allocable to electric power production.

A plain reading of the "operation and maintenance" clause requires reference to the definition of "Project", which is stated in terms of the actual facilities of the power production plant in the Central Valley. Taken together, Articles 5(b)(i) and 1(a) provide for the recovery of the "operation and maintenance expenses of the . . . electric power facilities of the Central Valley Project, California." Therefore, the "operation and maintenance" clause of the contract cannot be used to support the district court's legal conclusion that the parties clearly intended to permit the recovery by the government of the cost of bulk power purchased and imported from non-Project facilities in other states. The contract is too specific to encompass such an expense.

In 1964, Congress authorized the importation of power for the benefit of Central Valley Project customers through the Pacific Northwest Intertie. *See* Reclamation Project Act of 1939, 43 U.S.C. § 485h(c) (1976). The government contends that the

---

**3.** "The plain reading of the contract provides for the recovery of costs incurred by the government in furnishing power from its Central Valley Project facilities. Within those costs is the cost of importation of Centralia power." Order granting summary judgment, filed May 21, 1979.

definition of "Project" has been expanded as allowed in Article 1(a), by Congress' action. We reject this argument. Article 1(a) defines "Project" in terms of the Central Valley *facilities*, as then and thereafter authorized by Congress. The Intertie Program does not authorize the expansion of Project facilities; it merely authorizes the purchase of power from non-Project sources. Although Project power is increased, no expansion of Project facilities has taken place. As such, Congress' action does not clarify or expand the definition of "Project" as that term is used in the rate setting provisions of the contract.

(2) "Other costs as are properly recoverable under the Reclamation Act"

Article 5(b) of the contract states that government rates for the sale of Central Valley Project power shall not exceed that required:

> (iv) to return to the United States, within a minimum repayment period of fifty (50) years, or such repayment period as is provided for in the Federal Reclamation Law, such *other costs as are properly recoverable from Project power revenue, pursuant to Federal Reclamation Law in effect on the date of the execution of this contract.* (Emphasis added.)

The federal reclamation law in effect on the date of the contract, 43 U.S.C. § 485h (c) (1976), reads in pertinent part:

> Any sale of electric power ... made by the Secretary [of the Interior] in connection with the operation of any project or division of a project, shall be ... at such rates as in his judgment will produce power revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost, interest

on an appropriate share of the construction investment at not less than 3 per centum per annum, and such other fixed charges as the Secretary deems proper.

On its face this statute does not appear to permit the recovery of the cost of buying imported power. The Secretary is authorized to consider only maintenance, construction and other *fixed* costs in setting rates for the sale of electric power to Project customers. The purchase price of imported power is not a fixed cost.

Courts interpreting the Reclamation Act, however, have long recognized the inherent power of the Secretary to purchase power on "credit" from other sources when conditions prevent hydro-electric facilities from functioning at capacity. *See Kansas City Power & Light Co. v. McKay*, 115 F.Supp. 402 (D.D.C. 1953), *vacated on other grounds*, 225 F.2d 924 (D.C. Cir.), *cert. denied*, 305 U.S. 885, 76 S.Ct. 137, 100 L.Ed. 780 (1955).[4] During the course of a year, the Central Valley may experience seasonal variations in the flow of water from the surrounding mountains. During periods of "high flow" the Project produces more power than Central Valley customers need. The excess is sold to surrounding communities and the profits are credited against operational costs. In drought periods, the Project must often purchase power from nearby steam generating plants to meet its customers' needs. In the long run, the costs of these purchases are balanced against the profits from the sale of excess power during "high flow" season.

Although the purchase of supplemental power during times of need may always have been within the inherent power of the Secretary under the Reclamation Act, the

---

**4.** The *Kansas City Power* case interprets the Flood Control Act of 1944, 16 U.S.C. § 825s (1976), but this statute has been interpreted *in pari materia* with the Reclamation Act. *See Northern California Power Agency v. Morton*, 396 F.Supp. 1187, 1189 (D.D.C.1975).

In *Kansas City Power*, it is not clear whether the power purchases were pursuant to the type of "credit" arrangements described above. The

court, however, characterized the purchases as "reasonably incidental to the integration of hydro-electric power generated at the ... Project". 115 F.Supp. 402, 417.

Here, we cannot say that the purchase of half again as much outside power as is generated by the Central Valley Project at full capacity is a "reasonably incidental[ly]" integrated purchase.

authority to purchase imported power on a regular basis has only recently been bestowed upon the Secretary. As outlined above, Congress did not authorize the purchase of Intertie power until 1964. Inasmuch as the 1952 agreement only permits reference to "Federal Reclamation Law in effect on the date of the execution of the contract", we cannot affirm the District Court's decision based upon this subsequent authorization. The inherent power of the Secretary to purchase power during drought periods adds nothing which would change that result.

C. *An interpretation of this contract disallowing recovery of the cost of purchased power would not render it beyond the scope of the Secretary of Interior's authority and hence make it illegal.*

■ As an alternative ground for its decision, the district court found that an interpretation of the contract which failed to recognize the government's right to recover the cost of purchased power would restrict Congress' plenary power to define the scope of the Central Valley Project.[5] Since Congress does have this power, the court was concerned that a contract disallowing costs of purchased power would exceed the authority of the Secretary of Interior, and hence be illegal. It is a well-settled principle that ambiguously worded contracts should not be interpreted to render them illegal if a legal construction is plausible. *Walsh v. Schlecht,* 429 U.S. 401, 408, 97 S.Ct. 679, 685, 50 L.Ed.2d 641 (1977); *Seymour v. Hull & Moreland Engineering,* 605 F.2d 1105, 1115 (9th Cir. 1979).

■ A contract which commits the government to rates based solely on the cost of operating and maintaining plant facilities cannot be said to limit Congress' power to define the parameters of the Central Valley Project. Although Congress may want to consider existing customers' contracts before expanding the Central Valley Project, Congress is free to choose any method it wants to meet the increased power needs of the community. As SMUD points out, if Congress had authorized the construction of new facilities for the Project, SMUD would have been obligated to pay for these costs under its contract.

SMUD's interpretation of its contract with the government simply results in SMUD's being treated more favorably than other power customers. Such favorable treatment is not beyond the scope of the Secretary's authority. Like other governmental entities, SMUD receives a statutory preference in its purchase of power from the Central Valley Project as authorized by 43 U.S.C. § 485h(c) (1976). As this court stated in *City of Santa Clara v. Andrus,* 572 F.2d 660, 667 (9th Cir. 1978):

> [The Reclamation Act] does not require that all preference customers be treated equally or that all potential preference customers receive an allotment. *Arizona Power Authority v. Morton,* [549 F.2d 1239, 1241, 1252 (9th Cir. 1977)].

> \* \* \* \* \* \*

> Nothing in the legislative history of the Reclamation Project Act of 1939 suggests that Congress intended to limit the Secretary's discretion to interpret the preference clause in making decisions as to *whether or how or on what terms he will sell power to particular preference customers as compared to other preference customers.* (Emphasis added.)

The government cites no case law or legislative history to support its contention that a contract like the one in question illegally intrudes upon congressional power. Nor does it direct the court to authority for

5. "Even if the language is not clear, the contract must as a matter of law be interpreted to provide for its legality. To interpret it as defendant contends would make the contract illegal, since it would intrude upon the power of Congress to define the parameters of the project and restrict the methods in which Congress could provide for expansion of the capacity of the Central Valley Project to meet increased needs of users of Central Valley power." Order granting summary judgment, filed May 21, 1979.

the proposition that the Secretary cannot sell different customers different power at different rates. Accordingly we hold that it was not illegal for the Secretary to contract to sell SMUD hydro-electric power under the terms alleged by SMUD.

### CONCLUSION

On appeal we are only concerned with whether the district court erred in finding, as a matter of law, that the contract plainly provided for recovery of purchased power costs and in ruling that SMUD's interpretation of the contract would be illegal. The ultimate question of whether the contract allows the government to assess purchased power costs against SMUD is not before this court. We hold that the district judge erred in granting summary judgment for the government on either of the alternative grounds stated. Accordingly, the case is remanded to the district court for further proceedings.