926 F.2d 974
 SALT LAKE CITY, et al., Plaintiffs-Appellants,
v.
WESTERN AREA POWER ADMINISTRATION; William H. Clagett, in
his capacity as Administrator of the Western Area Power
Administration; The United States Department of Energy;
John S. Herrington, in his capacity as Secretary of Energy
of the United States, and the United States of America,
Defendants-Appellees,
Coalition of Consumer-Owned Power Systems, Amicus Curiae,
Colorado River Energy Distributors Association, Inc.,
Defendant-Intervenor/Appellee,
National Wildlife Federation, Grand Canyon Trust, American
Rivers, Inc., Amicus Curiae.
 No. 88-1976.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 22, 1991.
Rehearing Denied April 18, 1991.
 
 Donald B. Holbrook and William B. Bohling (Gregg I. Alvord, Elizabeth M. Haslam, and Michael Patrick O'Brien, also of Jones, Waldo, Holbrook & McDonough, Sidney G. Baucom, Gen. Counsel, Utah Power & Light Co., and Rogert F. Cutler and Bruce R. Baird, City Attys., Salt Lake City, Utah, Reed M. Richards, Weber County Atty., and Frank Warner and Douglas J. Holmes, Ogden, Utah, with them on the brief), for plaintiffs-appellants.
 Rex Lee of Sidley & Austin, Washington, D.C. (Donald R. Allen, Cyndi Stich, and J. Barton Seitz of Duncan, Allen and Talmage, Washington, D.C., Dale A. Kimball, Gary A. Dodge, and Jill A. Niederhauser of Kimball, Parr, Crockett & Waddoups, Salt Lake City, Utah, with him on the brief), for intervenor-appellee Colorado River Energy Distributors Ass'n, Inc.
 C. Max Vassanelli, Atty., Civ. Div., Dept. of Justice (John R. Bolton, Asst. Atty. Gen., Brent D. Ward, U.S. Atty., Dennis G. Linder, Robert S. Greenspan and Karen Stewart, Attys., Civ. Div., Dept. of Justice, of counsel Susan Earley, Western Area Power Admin., with him on the brief) Washington, D.C., for federal appellees.
 S. Elizabeth Birnbaum of Nat. Wildlife Federation, Washington, D.C., filed an amicus curiae brief on behalf of Nat. Wildlife Federation, Grand Canyon Trust and American Rivers, Inc.
 Clinton A. Vince and Nancy A. Wodka of Verner, Liipfert, Bernhard, McPherson and Hand, Alan H. Richardson, American Public Power Ass'n, Washington, D.C., C. Pinckney Roberts, Columbia, S.C., Wallace F. Tillman and Michael D. Oldak, Nat. Rural Elec. Coop. Ass'n, Washington, D.C., Charles L. Compton, Laurens, S.C., L. Clifford Adams, Jr., of Hurt, Richardson, Garner, Todd & Cadenhead, Atlanta, Ga., as counsel for Mun. Elec. Authority of Georgia, and Carlos C. Smith of Strang, Fletcher, Carriger, Hodge & Smith, Chattanooga, Tenn., as counsel for Tennessee Valley Public Power Ass'n, filed an amicus curiae brief on behalf of the Coalition of Consumer-Owned Power Systems.
 Before LOGAN and TACHA, Circuit Judges, and THEIS, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 Plaintiffs, Utah Power & Light (UP & L) and more than one hundred of its subscriber cities, towns and counties in Utah and Wyoming, appeal the district court's grant of summary judgment in favor of defendants, the Western Area Power Administration (WAPA), the Department of Energy (DOE), and various officials of these agencies. The district court found that WAPA's interpretation of federal law governing preference in the sale of federal hydroelectric power was reasonable and that WAPA's decision to purchase nonfederal power in order to maximize sales of firm federal power was not ultra vires.[1] We affirm.
 
 
 2
 * The activities challenged in this case fall under the jurisdiction of WAPA's Salt Lake City Area office, which markets power generated from the Salt Lake City Area Integrated Projects (SLCA-IP), including the Colorado River Storage Project (CRSP). The basic statute governing power marketing from the SLCA-IP is the CRSP Act, 43 U.S.C. Secs. 620-620o.[2] This Act incorporates the federal reclamation laws, including Sec. 9(c) of the Reclamation Project Act of 1939, governing preference in the sale of federal hydropower. 43 U.S.C. Sec. 620c.
 
 
 3
 WAPA sells power under long-term marketing criteria. While WAPA was formulating its Post-1989 General Power Marketing and Allocation Criteria, see 48 Fed.Reg. 38,289 (1983); 49 Fed.Reg. 34,900 (1984); and 51 Fed.Reg. 4,844 (1986), UP & L applied for federal power on behalf of its customer municipalities that had authorized it to do so. The application requested an allocation of power for the municipalities as qualified preference entities under the federal reclamation laws. The application stated that, upon receipt of an allocation of federal power, each municipality would enter into a contract with UP & L under which the latter would provide utility services at cost. UP & L also applied for a preferential allocation of federal power on its own behalf, to be resold to its customers at cost. Alternatively, UP & L argued that it should be allowed to bid for federal power. WAPA determined that neither UP & L nor its customers qualified as preference entities under applicable reclamation laws and accordingly rejected plaintiffs' applications.
 
 
 4
 * Plaintiffs' first challenge to WAPA's refusal to allocate power to them is based on federal preference law. Section 9(c) of the Reclamation Project Act of 1939, 43 U.S.C. Sec. 485h(c), provides that in the sale of federal hydroelectric power "preference shall be given to municipalities and other public corporations or agencies...." WAPA, the DOE, and the Bureau of Reclamation before them have consistently interpreted this provision as not giving preference to every city or town that fits the dictionary definition of "municipality." Rather, they have interpreted Sec. 9(c) to give preference only to those municipalities that operate their own utility systems. WAPA terms this prerequisite for preferential status a requirement of "utility responsibility."
 
 
 5
 Plaintiffs argue that the utility responsibility requirement is contrary to the plain language of Sec. 9(c). They argue that the statutory language clearly makes every municipality a preference entity and that WAPA's contrary interpretation is entitled to no deference. Rejecting this argument, the district court applied the analysis set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). The court first asked whether Congress had directly spoken to the precise question at issue, namely, whether the statutory preference given to municipalities mandates equal treatment of municipalities that own their own distribution systems and those that do not. Employing traditional tools of statutory construction, the court found no intent on this question. We agree.
 
 
 6
 Plaintiffs correctly point out that neither the court nor the defendants have controverted plaintiffs' oft-repeated assertion that the meaning of the word "municipalities" is clear. But plaintiffs' references to the Oxford English Dictionary do not make clear the meaning of a preference in the sales of power to municipalities. The question critical to this appeal, whether the preference applies only to sales directly to municipalities or also embraces indirect sales through investor-owned (i.e., for-profit) intermediaries such as UP & L, is not answered by asserting that "everybody knows ... a 'municipality' is a town or city." Plaintiffs-Appellants' Principal Brief at 13. If indirect sales are included, then the preference clause authorizes the agency to confer economic benefits upon investor-owned utilities.[3] It is not at all clear from the text of the statute that such a result was intended.
 
 
 7
 Nor do traditional tools of statutory construction yield any clear congressional intent on this issue. Defendants argue that the legislative history demonstrates that Congress intended the preference to extend only to entities capable of taking federal power directly and distributing it to consumers. Some portions of the legislative history arguably support this interpretation. See, e.g., 84 Cong.Rec. 10223 (1939) (remarks of Rep. Case); Hearings on H.R. 6773 Before the House Comm. on Irrigation and Reclamation, 76th Cong., 1st Sess. 122, 130-32 (1939) (colloquy between Rep. Winter and J. Kennard Cheadle, Bureau of Reclamation Chief Counsel). Even these isolated portions, however, are far from clear. We agree with the district court's conclusion that "[r]ead critically, the history, like the text, indicates that Congress in considering the preference clause simply did not contemplate the innovative proposal that the municipalities make here." III R. tab 233 at 40.
 
 
 8
 On the second prong of the Chevron analysis, 467 U.S. at 843, 104 S.Ct. at 2781-82, the district court found WAPA's interpretation of the preference clause "fully reasonable." III R. tab 233 at 40. We agree that WAPA's construction of the statute must be upheld.
 
 
 9
 The agency's interpretation need not be the only one it could have adopted, or the one that this court would have reached had the question initially arisen in a judicial proceeding. Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. Indeed, the agency's interpretation is entitled to special deference when, as here, the agency is interpreting a statutory scheme that it is entrusted to administer, its interpretation has " 'involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.' " Id. at 844, 104 S.Ct. at 2783 (quoting United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).
 
 
 10
 It is reasonable to conclude, as WAPA has, that the benefits of preferential access to federal hydroelectric power should be enjoyed by the public rather than the private sector. Plaintiffs' challenge to this interpretation, "fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress...." Id. at 866, 104 S.Ct. at 2793. Therefore, their challenge must fail. Id.
 
 
 11
 Plaintiffs also argue that, even if the utility responsibility requirement is reasonable, WAPA arbitrarily and capriciously refused to recognize plaintiffs' compliance with it. Specifically, they assert that a 1978 legal opinion of the DOE "suggested that power may be allocated to a city which secures through contract the means of delivering the power to its customers as well as administrative functions such as meter reading, billing and accounting." Plaintiffs-Appellants' Principal Brief at 17. The legal opinion referred to, however, indicates that in order to achieve utility responsibility, the applying city would have to own or lease utilities itself, and not merely contract with the investor-owned utility normally serving it to act as its agent in purchasing federal power. See Dep't of Energy General Counsel, "Request of City of Needles for Reinstatement of Sales of Federal Power for Benefit of Its Citizens" 3-5 (Nov. 21, 1978), III R.Supp. tab 216 App. K; see also id. at 5 ("As a practical matter Needles would likely be required to purchase, lease, or condemn [the investor-owned utility's] distribution system that serves the City and [the utility's] charter to provide utility service."). Nothing in the plaintiff municipalities' application suggests that they would take any steps to acquire UP & L's distribution system.
 
 
 12
 UP & L argues that it should be deemed a preference customer in its own right. As support for this proposition, UP & L points to its application for power on its own behalf, arguing that its proposal to distribute federal power at cost to its customers is consonant with the preference for "municipal purposes" contained in Sec. 5 of the Townsites and Power Act of 1906, 43 U.S.C. Sec. 522. The district court correctly held, however, that the preference provision of the Townsites Act does not apply to sales of CRSP power. Projects authorized and constructed after passage of the Reclamation Project Act of 1939 are governed by that statute's preference clause, see 43 U.S.C. Sec. 485h(a), which supersedes any prior inconsistent law, see id. Sec. 485j.
 
 
 13
 Alternatively, UP & L argues that it should be allowed to bid for federal power, because the preference clause creates a preference only as to price, and not as to right. We agree with the district court that the intended breadth of the preference is not clear from the legislative history. Compare, e.g., 84 Cong.Rec. 10225 (1938) (statement of Rep. Leavy) with id. at 10223-24 (colloquy between Reps. Case and O'Connor). WAPA's reasonable interpretation that the preference is as to right is entitled to deference and must be upheld. Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82.
 
 B
 
 14
 Plaintiffs also attack the Post-1989 Criteria as inconsistent with Sec. 5 of the Flood Control Act of 1944, 16 U.S.C. Sec. 825s. Section 5 provides that the Secretary of Energy shall dispose of excess electric power and energy generated at projects under the control of the Department of the Army "in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles...." Id. It is unclear whether Sec. 5's directives apply to power and energy generated by the CRSP. We agree with the Ninth Circuit, see City of Santa Clara v. Andrus, 572 F.2d 660, 667-68 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978), that it is unnecessary to decide this question.
 
 
 15
 Four circuits have considered whether Sec. 5's widespread use clause provides law to apply to an agency's power marketing decisions. We agree with their unanimous conclusion that it does not. See Brazos Elec. Power Coop. v. Southwestern Power Admin., 819 F.2d 537, 543-44, reh'g denied, 828 F.2d 1083 (5th Cir.1987); Electricities of North Carolina, Inc. v. Southeastern Power Admin., 774 F.2d 1262, 1266-67 (4th Cir.1985); Greenwood Util. Comm'n v. Hodel, 764 F.2d 1459, 1464-65 (11th Cir.1985); City of Santa Clara, 572 F.2d at 667-68. Thus, even if Sec. 5 of the Flood Control Act applies to the sale of power generated by the CRSP, implementation of that section in WAPA's power marketing decisions is "committed to agency discretion by law" under the Administrative Procedure Act, 5 U.S.C. Sec. 701(a)(2).
 
 II
 
 16
 * Plaintiffs next allege that WAPA's practice of buying and reselling power produced at nonfederal power plants (nonfederal power) is ultra vires and part of a scheme to "broker" nonfederal power in order to maintain the agency's importance in the electric power industry. WAPA purchases nonfederal power in order to "firm up" federal power supplies. Because hydropower fluctuates with water levels, its availability above a certain level cannot be guaranteed.[4] By purchasing nonfederal power, WAPA can ensure a dependable supply of energy. Plaintiffs argue that WAPA is without statutory authority to make such purchases and that its actions are therefore ultra vires. We agree with the district court's conclusion that the CRSP Act does not prohibit WAPA from purchasing nonfederal power.
 
 
 17
 The CRSP Act does not mention nonfederal power. The Act does provide, however, that CRSP projects "shall be operated in conjunction with other Federal power plants, present and potential, so as to produce the greatest practicable amount of power and energy that can be sold at firm power and energy rates...." 43 U.S.C. Sec. 620f. WAPA consistently has interpreted Sec. 620f as requiring it to purchase nonfederal power in order to maximize sales of federal power at firm rates.[5] In granting summary judgment, the district court similarly interpreted this section as requiring WAPA to do "what is reasonably necessary, which would include the acquisition and blending of nonfederal power, to maximize the sale of federal power at firm rates." III R. tab 233 at 51.
 
 
 18
 Emphasizing Sec. 620f's use of the word produce and its reference to other federal power plants, plaintiffs argue that the statute's language requires that all CRSP power be produced by federal power plants and that WAPA is therefore forbidden from purchasing nonfederal power. We disagree.
 
 
 19
 The plain language of Sec. 620f does not prohibit WAPA from purchasing nonfederal power; the words of the statute simply are not clear on this point. Further, the statute's legislative history does not demonstrate a congressional intent to prohibit nonfederal power purchases. See H.R.Rep. No. 1087, 84th Cong., 2d Sess., reprinted in 1956 U.S.Code Cong. & Admin. News 2346, 2362 (reiterating that hydroelectric powerplants should be operated to produce greatest amount of energy that can be sold at firm power rates). Nor can we accept plaintiffs' argument that WAPA cannot interact with nonfederal entities absent specific congressional approval. Although Congress occasionally has expressly authorized nonfederal power purchases,[6] courts "have long recognized the inherent power of the Secretary to purchase power on 'credit' from other sources when conditions prevent hydro-electric facilities from functioning at capacity." United States v. Sacramento Municipal Util. Dist., 652 F.2d 1341, 1345 (9th Cir.1981) (citing Kansas City Power & Light Co. v. McKay, 115 F.Supp. 402 (D.D.C.1953), vacated on other grounds, 225 F.2d 924 (D.C.Cir.), cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955)) (emphasis added). See also Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 338-39, 56 S.Ct. 466, 478-79, 80 L.Ed. 688 (1936) (recognizing authority of power marketing agency to interchange energy with private power company).
 
 
 20
 At the same time, however, Sec. 620f does not expressly direct WAPA to purchase nonfederal power. Rather, the plain language and legislative history of Sec. 620f merely direct WAPA to maximize the sale of federally produced power at firm rates. The statute and its legislative history are silent regarding how WAPA should accomplish this objective. As we discussed in Part IA, when an administering agency's interpretation of a statute is challenged, and traditional tools of statutory construction yield no relevant congressional intent, the reviewing court must determine if the agency's construction is a permissible one. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82.
 
 
 21
 WAPA's interpretation of Sec. 620f--that it requires WAPA to purchase nonfederal power in order to maximize sales of federal power at firm rates--is permissible. The availability of hydroelectric power fluctuates with water levels. Thus, if a federal project's hydroelectric power is sold by itself, "the amount of firm power available is reduced, and in some cases, firm power cannot be offered at all for some periods of time." 49 Fed.Reg. 34,900, 34,915 (1984). It therefore seems reasonable that WAPA interprets Sec. 620f as requiring it to purchase nonfederal power to ensure maximum sales of federally produced power at firm rates.
 
 
 22
 WAPA's interpretation of Sec. 620f is supported by several other factors. Federal power marketing agencies commonly employ firming arrangements. See, e.g., Brazos Elec. Power Coop., 819 F.2d at 540-41 (Southwestern Power Administration engaged in firming arrangement with private utilities company); Greenwood Util. Comm'n v. Mississippi Power Co., 751 F.2d 1484, 1490 (5th Cir.1985) (private utility company provides Southeastern Power Administration with thermal resources to enhance dependable capacity of its hydro resources). Moreover, courts interpreting general reclamation statutes have held that federal power marketing agencies have inherent authority to purchase some nonfederal power. See Sacramento Municipal Util. Dist., 652 F.2d at 1345; Kansas City Power & Light, 115 F.Supp. at 417-18. Finally, Sec. 14 of the Reclamation Project Act of 1939, 43 U.S.C. Sec. 389, clearly authorizes exchanges of federal for nonfederal power. Although WAPA's purchases of nonfederal power cannot be classified as exchanges of power, the Reclamation Act nonetheless demonstrates that Congress ordinarily does not intend to forbid federal power agencies from interacting with nonfederal power sources.
 
 B
 
 23
 Alternatively, plaintiffs challenge the scope of WAPA's nonfederal power purchases. According to its Post-1989 Criteria, WAPA is planning to purchase nonfederal power on a new scale. In the past, WAPA's purchases of nonfederal power were based on an average water year basis; purchase of power in drought years was balanced by excess federal power in wet years. 49 Fed.Reg. 34,900, 34,923 (1984). Under the Post-1989 Criteria, however, WAPA plans to purchase 400 gigawatt hours of nonfederal power to meet its firm commitments in an average water year. 51 Fed.Reg. 4,844, 4,845 (1986). Plaintiffs argue that this proposal violates case law limiting the amount of nonfederal power that WAPA may purchase. The district court rejected this argument and held that WAPA may purchase such nonfederal power as is "reasonably necessary" to maximize the sale of federal power at firm rates. III R. tab 233 at 51.
 
 
 24
 We agree with plaintiffs' contention that WAPA does not have unlimited authority to purchase nonfederal power. Interpreting general reclamation statutes, courts have held that power marketing agencies may purchase such nonfederal power and energy as is reasonably incidental to the integration of federally produced hydroelectric power. See Kansas City Power & Light, 115 F.Supp. at 417. See also Sacramento Municipal Util. Dist., 652 F.2d at 1345-46 (Secretary of Energy has inherent authority to purchase nonfederal power necessary to compensate for adverse weather conditions). In the instant case, Congress has directed WAPA to maximize the sale of federally produced power at firm rates. We therefore believe that WAPA may purchase only such nonfederal power as is reasonably incidental to meeting this objective.
 
 
 25
 We apply the arbitrary and capricious standard of review to WAPA's nonfederal power purchasing decisions. 5 U.S.C. Sec. 706(2)(A); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971); Phillips Petroleum Co. v. Environmental Protection Agency, 803 F.2d 545, 558 (10th Cir.1986). In Citizens to Preserve Overton Park, the Supreme Court explained that a court applying the arbitrary and capricious standard:
 
 
 26
 "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."
 
 
 27
 401 U.S. at 416, 91 S.Ct. at 824 (citations omitted).
 
 
 28
 Applying this standard, we conclude that the proposed nonfederal power purchases found in WAPA's Post-1989 Critieria are not arbitrary and capricious. WAPA examined the relevant factors in concluding that the scope of its nonfederal power purchases was reasonably incidental to maximizing sales of federally produced power at firm rates. See 51 Fed.Reg. 4,844, 4,856-58 (1986); 49 Fed.Reg. 34,900, 34,923-24 (1984). We cannot say that WAPA made a clear error of judgment in reaching this conclusion. We therefore affirm the district court's decision that, as a matter of law, such purchases are not ultra vires.
 
 
 29
 In a closely related argument, plaintiffs challenge WAPA's determination of expected CRSP firm marketable resources for the post-1989 period. Plaintiffs contend that WAPA arbitrarily and unreasonably overestimated CRSP hydro resources in deriving the Post-1989 Criteria, thereby "creat[ing] new paper resources that will require WAPA to purchase even more nonfederal power to enable it to meet its contractual obligations when" these resources fail to materialize. Plaintiffs-Appellants' Principal Brief at 41. We disagree. Our review of the record convinces us that WAPA's estimation of future CRSP firm marketable resources was not arbitrary and capricious. See 51 Fed.Reg. 4,84 4, 4,856-58 (1986); 49 Fed.Reg. 34,900, 34,920-24 (1984); III R. tab 233 at 48-49 n. 38. We therefore reject this argument.
 
 C
 
 30
 Finally, plaintiffs allege that WAPA's decision to participate with private utilities in the construction and financing of the Craig-Bonanza transmission line is ultra vires and that the transmission line is being built to promote WAPA's "brokering activities." As plaintiffs point out, Sec. 1 of the CRSP Act, 43 U.S.C. Sec. 620, expressly authorizes the construction of only specified "initial units" of the Colorado River Storage Project. Nowhere in the CRSP Act, however, does Congress prohibit the construction of future transmission lines in connection with the project. In fact, by Sec. 302 of the Department of Energy Act, Congress grants the Secretary of Energy broad authority to build, operate, and maintain transmission lines. See Department of Energy Organization Act, Sec. 302, 42 U.S.C. Sec. 7152(a)(1)(E) (transferring to Secretary of Energy "the power marketing functions of the Bureau of Reclamation, including the construction, operation, and maintenance of transmission lines and attendant facilities"). We therefore conclude that Congress has authorized WAPA, as an agency within the Department of Energy, to engage in the construction of the Craig-Bonanza transmission line.
 
 
 31
 We are not persuaded that Sec. 5 of the Flood Control Act of 1944, 16 U.S.C. Sec. 825s, mandates a different result. Congress has never expressed an intent to make Sec. 5's restrictions on the construction of transmission lines applicable to any projects except those delivering energy generated at projects under the control of the Department of the Army. To the contrary, Congress has granted WAPA broad authority to construct transmission lines. See 42 U.S.C. Sec. 7152(a)(1)(E).
 
 
 32
 Accordingly, we AFFIRM the district court's decision granting WAPA's motion for summary judgment.[7]
 
 
 33
 TACHA, Circuit Judge, dissenting.
 
 
 34
 I respectfully dissent from the majority on whether this court must defer to the determination of Western Area Power Administration (WAPA) that the approximately 155 Utah and Wyoming cities, counties, and towns represented by Utah Power and Light (UP & L) are not preferred entities under the Colorado River Storage Project Act (CRSP Act), 43 U.S.C. Secs. 620-20a, and section 9(c) of the Reclamation Project Act of 1939 (Reclamation Act), 43 U.S.C. Sec. 485h(c). Deferential review of an agency's statutory construction under Chevron, USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), does not apply to this case because Congress expressed in section 9(c) a clear intent about whether municipalities are preferred entities in the distribution of power from federal sources. I find Congress's intent about a preference for municipalities clearly expressed in the words of the statute and am convinced we must reject WAPA's requirement that municipalities have utility responsibility in order to receive preference under the statute. Although I agree with the majority's holding in Part II that the CRSP Act does not prohibit WAPA from purchasing nonfederal power, I would reverse the district court's finding that the Utah and Wyoming cities, counties, and towns represented by UP & L are not preferred entities under the Reclamation Act.
 
 
 35
 The Supreme Court in Chevron explained the approach federal courts must follow in construing statutory language:
 
 
 36
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress.
 
 
 37
 Id. at 842-43, 104 S.Ct. at 2781. Based on Chevron, a reviewing court defers to a reasonable agency interpretation only on issues Congress did not address--"gap[s] left, implicitly or explicitly, by Congress." Id. at 843, 104 S.Ct. at 2781. As the Court pointed out, gaps may indicate Congress's implicit or explicit delegation of authority to the agency to regulate that specific issue. Id.
 
 
 38
 In a series of cases following Chevron, the Court has reiterated that deferential review does not replace the federal courts' continuing duty to interpret statutes using the traditional tools of statutory construction. See Dole v. United Steelworkers, 494 U.S. 26, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990); NLRB v. United Food & Commercial Workers Union, 484 U.S. 112, 123, 108 S.Ct. 413, 420-21, 98 L.Ed.2d 429 (1987); see also INS v. Cardoza-Fonseca, 480 U.S. 421, 430-46, 107 S.Ct. 1207, 1212-21, 94 L.Ed.2d 434 (1987) (applying traditional tools of statutory construction to statutory requirements to determine whether two standards are identical). Deferential review is only appropriate when a court is unable to discern congressional intent. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781; National Grain & Feed Ass'n v. OSHA, 866 F.2d 717, 733 (5th Cir.1989). A court does not defer to an agency interpretation--even a longstanding interpretation--that is clearly at odds with the plain language of the statute. See Public Employees Retirement Sys. v. Betts, 492 U.S. 158, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989).
 
 
 39
 We review de novo a district court's finding about statutory intent. Stissi v. Interstate & Ocean Transp. Co., 765 F.2d 370, 374 (2d Cir.1985); United States v. Horowitz, 756 F.2d 1400, 1403 (9th Cir.), cert. denied, 474 U.S. 822, 106 S.Ct. 74, 88 L.Ed.2d 60 (1985). In determining whether Congress expressed an intent regarding the preferred status of municipalities, we begin with the statute's language. Mead Corp. v. Tilley, 490 U.S. 714, 109 S.Ct. 2156, 2162, 104 L.Ed.2d 796 (1989); see Glenpool Util. Servs. Auth. v. Creek County Rural Water Dist. No. 2, 861 F.2d 1211, 1214 (10th Cir.1988), cert. denied, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). As the Supreme Court has noted, the legislative purpose generally is expressed in the ordinary meaning of the words Congress has used. United States v. Locke, 471 U.S. 84, 95, 105 S.Ct. 1785, 1792-93, 85 L.Ed.2d 64 (1985); see Burlington N. R.R. v. Oklahoma Tax Comm'n, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859-60, 95 L.Ed.2d 404 (1987). The most fundamental guide to statutory construction is common sense. First Methodist Church v. United States Gypsum Co., 882 F.2d 862, 869 (4th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990).
 
 
 40
 Section 9(c) of the Reclamation Act, incorporated into the CRSP Act, states that in "sales [of power] preference shall be given to municipalities." 43 U.S.C. Sec. 485h(c). In my view, there is no inherent ambiguity in this provision. Congress used the word "shall" not "may" in the statute, thereby clearly indicating its intent that municipalities receive preference. See United States v. Rodgers, 461 U.S. 677, 705-06, 103 S.Ct. 2132, 2148-49, 76 L.Ed.2d 236 (1983); United States v. White, 887 F.2d 705, 710 (6th Cir.1989). Further, I fail to perceive any ambiguity in Congress's use of the term "municipalities." When Congress enacts legislation using other common terms for political or administrative subdivisions such as "state" or "circuit", we simply interpret the plain language of the statute without concluding these terms are ambiguous and require extraneous definition. Likewise, I am convinced we do not need to refer to extraneous definitions to understand what Congress meant by using the common term "municipalities" in section 9(c).
 
 
 41
 WAPA's position--that "municipalities" must mean "entities with utility responsibility" when read in the context of the legislative history and administrative interpretation--leaves me baffled. According to traditional rules of statutory construction, we look first to the statutory language and then, if necessary, to the legislative history and statutory construction by an administering agency. See Brock v. Writer's Guild, West, Inc., 762 F.2d 1349, 1353 (9th Cir.1985); Baltimore Gas & Elec. Co. v. Heintz, 760 F.2d 1408, 1413 (4th Cir.1985). It is settled law that when statutory language is unambiguous and free from irrational result, the plain language of the statute controls. See, e.g., Glenpool Util. Servs., 861 F.2d at 1214 (citing Edwards v. Valdes, 789 F.2d 1477, 1481 (10th Cir.1986)).
 
 
 42
 WAPA's argument subverts these well-established rules by relying on an agency construction to introduce ambiguity into the statutory language. I agree with the district court that the legislative history of section 9(c) is not "particularly helpful or conclusive" regarding a municipality's utility responsibility. See Reclamation Project Act of 1939: Hearings on H.R. 6773 and H.R. 6984 Before the House Comm. on Irrigation and Reclamation, 76th Cong., 1st Sess. (1939). Further, I am convinced the reference to municipalities in the statute is unambiguous apart from the controversy created by the agency's extraneous requirement of utility responsibility. See Request of City of Needles for Reinstatement of Sales of Federal Power for Benefit of its Citizens, Department of Energy General Counsel Opinion (November 1978); see also Disposition of Surplus Power Generated at Clark Hill Reservoir Project, 41 Op. Att'y Gen. 236 (1955). In my view, bootstrapping a regulation dealing with a statute to justify an agency construction of that statute is improper--especially when the compatibility of the regulation with legislative intent is at issue.
 
 
 43
 The majority assumes a principal distinction Congress may have intended to make in enacting section 9(c) was between municipalities purchasing power directly and those receiving it indirectly. This assumption is not supported by either the language of the statute or its legislative history. For purposes of interpreting the statute to ascertain Congress's intent, I can see no difference between the power request of a single municipality and the request of a group of municipalities represented by another entity that distributes power to them at cost. In my view, the congressional intent expressed in the plain language of section 9(c) is to provide preference to municipalities simply based on their status as political subdivisions, not on their capacity to distribute power.
 
 
 44
 In asking if Congress addressed the "precise issue" whether municipalities with utility responsibility and those without should receive equal treatment, the majority overlooks the real issue in this case: Whether section 9(c) requires WAPA to give preference to municipalities. On this question, the statute is clear--"preference shall be given to municipalities." 43 U.S.C. Sec. 485h(c). The WAPA regulations at issue here prevent municipalities from receiving preference when they do not satisfy an agency prerequisite of utility responsibility. Because I find Congress's language in section 9(c) unambiguous about a preference for municipalities, I conclude we cannot defer to a contrary agency construction. I would hold as a matter of law the agency requirement of utility responsibility, which precludes some municipalities from receiving preference, contradicts the clear congressional mandate that WAPA give municipalities preference.
 
 
 
 *
 The Honorable Frank G. Theis, Senior United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 The district court denied summary judgment on UP & L's claim that WAPA violated applicable environmental laws by failing to prepare an environmental statement in connection with the promulgation of the new Power Marketing Criteria. Finding no just reason for delay, however, the district court certified, under Fed.R.Civ.P. 54(b), its rulings on the preference and ultra vires claims as final, and plaintiffs timely appealed
 
 
 [2]
 The SLCA-IP also includes the Collbran and Rio Grande projects. These projects, however, do not have specific statutes governing their operation
 
 
 [3]
 Despite UP & L's agreement to deliver CRSP power at "cost" (a term not defined in the applications), access to cheap federal power undoubtedly would provide significant economic benefits for UP & L
 
 
 [4]
 According to WAPA's glossary of terminology, "firm energy" is "electric energy which is intended to have assured availability to the customer to meet all or any agreed portion of his load requirements." III R. tab 233 at 48 n. 37. "Firm power" is "power which is guaranteed by the supplier to be available at all times...." Id
 
 
 [5]
 See III R. tab 233 at 54 n. 47. Plaintiffs contend that government officials have long questioned whether power marketing agencies have authority to purchase nonfederal power. See Hearings on the New Power Policy and Marketing Criteria of the Dep't of the Interior Before the Senate Judiciary Comm., 83d Cong., 2d Sess. 489, 500-01 (1954), III R.Supp. tab 216 App. N (1954 statement of Interior Solicitor, Clarence B. Davis, questioning authority of Department of Interior to purchase amount of nonfederal power resulting in greatest profit to government) [hereinafter 1954 Marketing Criteria Hearings]; Op.Compt.Gen. B-222908 at 2 (Oct. 17, 1986), III R.Supp. tab 216 App. J (1986 opinion of Comptroller General of United States noting that Congress has not affirmatively authorized WAPA to purchase nonfederal power) [hereinafter 1986 Op.Compt.Gen.]. Even these isolated statements, however, are far from clear. Under further questioning, Solicitor Davis noted that he did not intend to question the Department of the Interior's authority to purchase nonfederal power on an average year basis. See 1954 Marketing Criteria Hearings at 512-13. Similarly, the Comptroller General recognized WAPA's inherent authority to purchase incidental nonfederal power. See 1986 Op.Compt.Gen. at 3
 
 
 [6]
 See, e.g., 43 U.S.C. Sec. 1523(b) (Secretary of Energy may purchase such nonfederal power as he deems necessary in connection with operation of Central Arizona Project)
 
 
 [7]
 We have not reviewed the district court's ruling that an issue of fact exists concerning whether WAPA was cloaking illegal marketing activities through its participation in the Rocky Mountain Generation Cooperative ("RMGC"). III R. tab 233 at 59-60. Although plaintiffs contend that this ruling is inconsistent with the remainder of the district court's opinion, the parties have agreed to hold this issue in abeyance pending the outcome of this appeal. See Brief of Appellants at 30 n. 15, 43