CITY OF VERNON, CALIFORNIA,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Southern California Edison
Company, Intervenor.

No. 91–1445.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 16, 1992.

Decided Jan. 22, 1993.

**1090**

Arnold Fieldman with whom Channing D. Strother, Jr., Washington, DC, were on the brief, for petitioner.

Joel Cockrell, F.E.R.C., with whom William S. Scherman, Jerome M. Feit and Joseph S. Davies, F.E.R.C., Washington, DC, were on the brief, for respondent.

Arthur L. Sherwood, Los Angeles, CA, with whom Stephen Pickett, Rosemead, CA, Richard M. Merriman and Brian J. McManus, Washington, DC, were on the brief, for intervenor.

Before: EDWARDS, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Southern California Edison Company provides power to six municipal customers: the cities of Vernon, Anaheim, Riverside, Banning, Colton, and Azusa (the last five being referred to collectively as the "Anaheim group"). Each city owns and operates power systems that supply customers in their communities. Each purchases part of its power supply from Edison, getting the balance from other sources. The company provides transmission of the non-Edison power purchased by these resale customers.

Since 1984 Edison has offered its municipal customers two kinds of arrangements for transmitting non-Edison power: integrated and non-integrated. Under the integrated arrangement, each city turns over its non-Edison resources to Edison, which takes charge of scheduling and dispatching the power for the customer's benefit. The customer receives a "capacity credit" for its contribution to Edison's generating resources, reflecting the amount turned over to Edison less a fraction for transmission losses and a margin placed in emergency reserves, and has its monthly bill reduced by the amount of the net credit. To the extent the emergency reserves are unused, Edison gets the benefit of the uncredited non-Edison power.

Under the non-integrated agreement, a customer does not turn over control of its outside resources to Edison. Rather, the customer itself schedules delivery of the resource to its town system. The customer contributes no power to Edison's pool of resources and gets no credit against its purchases of Edison power. Such a customer has the advantage that it need make no contribution to Edison's reserves; on the downside, however, the non-integrated customer gets no right to low-cost emergency backup power if Edison is unable to transmit the customer's external power.

Some of the power that Edison sells to its customers comes from three federal dams on the Colorado River—the Hoover, Parker, and Davis dams, here referred to simply as Hoover. Sometime in the 1980s, the government decided to allow municipal-

ities to make direct purchases of Hoover power, availability to start in June 1987. All six of Edison's municipal customers elected to take advantage of the change and, pursuant to Edison's tariff, to use Edison for transmission of the power. Edison offered its customers both the integrated and the non-integrated options.

The cities of the Anaheim group opted for integrated agreements, and began purchasing Hoover power the day it became available. Vernon sought non-integrated transmission of its Hoover power, but protested to FERC that the terms of Edison's proffered non-integrated arrangement were not "just and reasonable". See 16 U.S.C. §§ 824d(a) & (b), 824e(a).[1] Petitioner objected that the draft contract gave Edison too much discretion to curtail Vernon's transmission, that its nominally pro rata curtailment terms were in effect not pro rata, and that the draft term on commencement of service was in reality a weapon designed by Edison to bludgeon customers into choosing the integrated arrangement.

An administrative law judge agreed with Vernon, and ordered Edison's draft contract modified. *Southern California Edison Co.*, 39 FERC 63,045 (1987) ("ALJ Decision"). On review, the Commission (in so far as relevant here) reversed the ALJ, either approving the terms of Edison's draft or (as to the commencement provision) finding the dispute moot. *Southern California Edison Co.*, 55 FERC 61,074 (1991) ("Order No. 361"). The Commission denied Vernon's petition for rehearing. *Southern California Edison Co.*, 56 FERC 61,117 (1991). As the Commission decision is supported by substantial evidence and reasoned decisionmaking, we deny Vernon's petition for review.

*Excessive Discretion to Curtail*

One element of Vernon's attack on Edison's curtailment discretion is comparative—a claim that Edison has greater discretion as to non-integrated transmission than as to integrated, and that this differential is an "undue preference" invalid under § 205(b), 16 U.S.C. § 824d(b). That the terms of curtailment are different is indisputable. Under the integrated agreement, Edison curtails transmission in only two situations: (1) to perform required maintenance, in which case Edison must give customers reasonable advance notice; and (2) in response to major incidents beyond Edison's control, such as natural disasters, sabotage, or government actions, in which case no advance notice need be provided to customers. ALJ Decision, 39 FERC at 65,-217–18.

■ The non-integrated arrangement contains fundamentally different curtailment provisions. The agreement is silent as to the issue of advance notice, and instead distinguishes between "jeopardy" and "non-jeopardy" curtailment situations. Edison may invoke jeopardy curtailment any time continuity of service within its "control area" is threatened. *Id.* at 65,217. (Vernon has made no complaint as to this, perhaps, as the ALJ suggested, because the density of the control-area network makes the chance of curtailment extremely remote. *Id.*) The non-jeopardy curtailment provision relates solely to distant transmission lines *outside* Edison's control area. As to these, Edison can reduce Vernon's transmission of Hoover power whenever the transfer capability of the transmission facilities "under electrical system conditions existing at the time" is less than the facilities' theoretical or rated transfer capability. See Opinion No. 361, 55 FERC at 61,218 & n. 29. Edison may implement non-jeopardy curtailment only after it has

---

**1.** There is some dispute between Vernon and Edison (an intervenor here) as to whether the proceeding was under § 205 or § 206 of the Federal Power Act, 16 U.S.C. §§ 824d, 824e. If under the former, Edison had the burden to show that the contracts terms were just and reasonable, while under the latter Vernon had to show that they were not. See, e.g., *Public*

*Service Comm'n v. FERC,* 642 F.2d 1335, 1345 (D.C.Cir.1980). The circumstances out of which the proceeding arose are somewhat obscure, making resolution of that disagreement difficult; because we find the Commission decision quite supportable even if Edison had the burden, we do not resolve the issue.

first discontinued all interruptible transmission, and then does so pro rata on the basis of each user's share of firm entitlements. ALJ Decision, 39 FERC at 65,217.

Vernon utterly fails to show why the curtailment provisions should be identical when the two types of service are otherwise so completely different. With integrated wheeling, Edison controls scheduling and delivery of power, and the customers contribute to Edison's reserve margins. With non-integrated wheeling, Vernon controls scheduling and delivery, and contributes nothing towards Edison's reserves. Given these differences, the Commission appears on solid ground in rejecting the idea that "the terms of service for wheeling an integrated resource should serve as the standard against which to evaluate the terms of service for wheeling a noninte-grated resource." Order No. 361, 55 FERC at 61,221.

Apart from its comparative claim, Vernon argues that the discretion allowed Edison under the draft agreement is, in context, so great as to render the service non-firm and the terms unjust and unreasonable. (All parties at this stage appear to agree that Vernon was entitled to "firm" service, but none explains the source of the entitlement.) Vernon points to evidence (which Edison does not directly contradict) that actual capability will almost always be less than rated capacity, so that Edison in principle will have a broad discretion to curtail. Moreover, Vernon claims that Edison has much incentive to curtail, as interruption of Vernon's Hoover power will force Vernon to step up its purchases of Edison's own power. Finally, Vernon argues that as the terms of curtailment are not in its view genuinely pro rata (discussed in more detail below), Edison will be able to curtail Vernon at little cost to itself—and thus will be all the more likely to succumb to the temptation to order unneeded curtailments.

The Commission rejected Vernon's theory, saying that it believed that "utility operating criteria will govern Edison's scheduling of available transmission capacity." 55 FERC at 61,222. In its summary of the positions of the parties it had noted the evidence marshalled by its Trial Staff that Edison's curtailments had been infrequent and typically scheduled for offpeak times. Id. at 61,220–21. Indeed, the Trial Staff Brief calculated outages from peak service at .3% of the peak hours from January 1, 1983 through November 24, 1985, see Joint Appendix ("J.A.") 542, and Vernon has not challenged that calculation. Thus the Commission's finding as to Edison's future behavior appears well supported in so far as it rests on its past practice.

 Of course, the period of the Trial Staff's detailed analysis was one in which Edison was not subject to the incentives that Vernon claims will lead to excessive curtailment. But—apart from the fact that Vernon points to no abuse since the inception of non-integrated service in June 1987—there are remedies for Vernon if Edison should improperly curtail. A party aggrieved by an action violating any statute, rule, order or other law under FERC's jurisdiction may appeal to the Commission for relief. 18 CFR § 385.206 (1992). Municipalities may challenge any action of a public utility such as Edison that violates a statute administered by FERC simply by filing a complaint with the Commission. 16 U.S.C. § 825e (1988). We cannot say that the Commission was arbitrary in relying on Edison's record, especially in view of the solutions available if the Commission proves to have been too sanguine.

Vernon also claims that, in finding Edison's transmission service "firm", FERC disregarded its own precedents as to the meaning of the term. None of Vernon's cases is on point. It tries, for instance, to extract from *New England Power Co.*, 49 FERC 61,129 (1989), the theory that to be firm, service must "approach[ ] the reliability of native load service". *Id.* at 61,553. But it is plain that the Commission was merely discussing a statement it had made in an earlier pass at the case, explaining why that statement did not aptly describe the service offered; the Commission was not declaring some general definition of firm service.

Even more far-fetched is Vernon's reliance on *Pacific Gas & Electric Co.*, 53 FERC 61,146 (1990), which found service non-firm where the utility was entitled to interrupt the service "for any reason including, but not limited to ... [certain interexchange transactions]." *Id.* at 61,-532. Vernon analogizes these interexchange transactions to the status of Edison's use of facilities for its "economy energy" purchases. As there was *no* limit to the reasons the utility could invoke to curtail the customer in *PG & E*, it escapes us what good the analogy could do Vernon. Moreover, under Edison's contract (as we shall see), its economy energy purchases are merely on a *par* with Vernon's transmission, not ahead of it, so the analogy is wholly invalid.

Finally, the definition of firm power that Vernon extracts from *Salt Lake City v. Western Area Power Administration*, 926 F.2d 974, 980 n. 4 (10th Cir.1991)—"power which is guaranteed by the supplier to be available at all times"—has no relevance. The definition relates to power, not transmission, and is simply quoted from the Western Area Power Administration's glossary of terms; it can hardly be binding on FERC.

It would have helped if the Commission had offered a definition of firm service against which to measure that provided in Edison's draft contract. Perhaps the issue is so contextual that any general definition would be too vague to be useful. The contract clearly requires Edison to curtail interruptible service before curtailing Vernon's and, after that, subjects Vernon only to curtailment pro rata with Edison's own transmissions. Nothing Vernon adduces suggests this cannot be viewed as firm, unless there is some serious flaw in the provision for pro rata curtailment, the issue to which we now turn.

*The Pro Rata Curtailment Method*

■ Vernon argues that the system of pro rata curtailment devised by Edison is not genuinely pro rata: under some circumstances it allows Edison to curtail a higher proportion of Vernon's Hoover power than of Edison's own firm power.

The supposed discrepancy arises out of the fact that there are three uses to which Edison may put its lines (apart from transmission for Vernon and others similarly situated): transmission of its own firm energy supplies; transmission of so-called "economy energy", i.e., energy available to it on an interruptible basis and thus at a bargain price; and unloaded capacity (which Vernon calls "empty space"), which is held in reserve for immediate use in the event that some outage or surge in demand may require Edison to draw on reserve power. These are called "spinning reserves"; Edison sometimes uses some of its entitlements to Hoover power for this purpose.

In the event of curtailment, Vernon's pro rata reduction comes entirely out of its firm energy transmission, while Edison's may come disproportionately out of its transmission of economy energy or its unloaded capacity. For example, assume line capacity of 1000 megawatts (MW), with Vernon's and Edison's uncurtailed uses for transmission of firm capacity being 100 MW and 600 MW respectively. Assume further that the remaining 300 MW of Edison's capacity is used for economy energy and unloaded capacity. If line capability suddenly drops 10%, Vernon's transmission will be reduced 10%; Edison's transmission of its own firm energy supplies may not be reduced at all, as it may allocate its own reduction to economy energy or to unloaded capacity. Finding this unreasonable as against Vernon, the ALJ proposed to require Edison to curtail all its uses of capacity for economy energy or unloaded capacity before hitting Vernon's transmission; once curtailment started to affect either party's transmission of firm energy, Vernon's and Edison's would decline pro rata.

The Commission appears correct in its conclusion that Vernon's method "would actually accord Vernon a larger relative share of capability after curtailment than before." Opinion No. 361, 55 FERC at 61,222. Indeed, Vernon's argument seems to depend on an implicit delegitimation of Edison's uses of capacity for economy energy and unloaded capacity for spinning re-

serves. There appears no support for this denigration.

Edison uses economy energy to reduce its overall costs. If its access to economy energy is denied, costs for Edison's customers will rise. As the Commission Trial Staff argued, Vernon's curtailment method would force Edison to adopt "most cost" as opposed to "least cost" generation for its system as a whole. J.A. 541–42. Vernon offers nothing to contradict that analysis.

Similarly, unloaded capacity for use of spinning reserves is a valuable use of capacity, enabling Edison to handle a sudden outage or surge in demand. In fact, Petitioner concedes that "[i]f Vernon itself owned the transmission facilities in question, Vernon would, as a prudent utility, use the facilities with an adequate reserve margin...." Petitioner's Brief at 31. If an unloaded reserve margin is part of the bundle of uses among which a prudent utility allocates transmission space, it is unclear why Edison should not be allowed to count such unloaded space in its curtailment. If Edison allocates a portion of its curtailment to unloaded capacity, then it is to that extent unable to use Hoover power for spinning reserves and must replace it with capacity elsewhere in its system. Vernon's argument about empty space boils down to nothing more than a repetition of its complaint that, in the event of an interruption, it might have to curtail more firm Hoover power than Edison does.

In its Reply Brief Vernon advances three arguments against Edison's claim that spinning reserves are an essential element of its capacity allocation. First, Vernon states that the spinning reserves argument "confuses jeopardy curtailment with non-jeopardy curtailment." Reply Brief at 7. Appellant appears to mean that Edison should only be able to forestall curtailment of unloaded capacity in situations where system integrity is threatened, for only then could wheeling of spinning reserves become necessary. But suppose that non-jeopardy curtailment conditions arise and Edison is required to curtail all of its unloaded capacity before it curtails Vernon's firm Hoover energy. If a system failure

occurs during such curtailment period, Edison will have no capacity available to wheel spinning reserves to maintain system integrity. Implicit in Vernon's argument is an idea that Edison could then invoke additional jeopardy curtailment to free the space needed to wheel reserves, so that there is no need for Edison to keep unloaded capacity on hand in non-jeopardy situations. This argument suffers from two fatal defects. First, it contradicts the statement of both the Commission and Vernon itself that maintaining a reserve of unloaded capacity is critical to prudent system management. Second, it is not true that Edison can so easily free the needed spinning reserve capacity by ordering further jeopardy curtailment. Under the pro rata method, Edison will also have to curtail more of its own power, restricting the company's ability to allocate transmission space optimally for its overall system. Vernon fails to refute Edison's argument that empty space is not dead or unused space, but serves a reserve function important for proper system management. Counting that space towards non-jeopardy curtailment is not, therefore, the empty gesture that Vernon claims it to be.

Second, Vernon says that because Edison must make up the difference to Vernon when it curtails the city's Hoover power transmission, the company does not enhance system integrity "when it curtails Vernon's resources in order to maintain spinning reserves." Reply Brief at 7. This seems to misstate the issue, which is whether an entitlement to transmission can be "firm" even though it is on a par with (rather than ranked above) the transmission company's use of capacity for spinning reserves. Indeed, Vernon's third argument itself states the issue to be whether Edison may properly count unloaded capacity towards its own share of pro rata curtailment. As Petitioner's second and third arguments either miss the point or simply identify the issue, they do not advance Vernon's cause.

*The Edison Draft's Commencement Term*

Edison's draft agreement for non-integrated service provided that service should commence only on the later of three dates, one of them being the date when

FERC approved the agreement with no modifications unacceptable to either party and the decision was no longer subject to judicial review. See ALJ Decision, 39 FERC at 65,223. Vernon claimed that the resulting delay would give Edison an unfair advantage in negotiating the terms of service if the customer needed transmission sooner. Edison argued that the issue would be moot if—as proved to be the case—service started promptly on an interim basis. Although this occurred two months after Hoover power first became available to Vernon, offsetting adjustments were made to cover those months, and Vernon makes no claim to compensation for interim losses. The Commission found Vernon's argument moot.

In seeking reversal of that determination, Vernon invokes the familiar exception for wrongs capable of repetition yet evading review. In fact, even if we assume that Edison's stratagem is likely to satisfy the first element of that doctrine, the dispute need not evade review. It does so here only because of Vernon's own choices about how to react. There are two ways in which it could have preserved the issue. First, it could have challenged the non-integrated draft before FERC and in the interim agreed to integrated transmission of its non-Edison power. Second, it could have accepted the unsatisfactory non-integrated draft under the alleged coercion, and then attacked the contract's coerced and coercing terms. Under these circumstances the Commission would evidently hear the claim. See *Northeast Utilities Service Co.*, 52 FERC 61,097 at 61,487 (1990). If the challenge came up under § 205, retroactive relief would be available under § 205(e)'s refund provision. See, e.g., *Central Illinois Light Co.*, 10 FERC 61,248 at 61,475 (1980). As such claims do not necessarily evade review, we agree with FERC that the issue was moot.

\* \* \* \* \* \*

The petition for review is

*Denied.*